CORLEY *et al. v.* REED *et al.*

(Division A.  Jan. 9, 1933.)

[145 So. 241.  No. 30198.]

Maynard, Fitzgerald & Venable, of Clarksdale, for appellants.

680

**B. B. Allen** and **P. W. Allen,** both of Indianola, for appellees.

**McGowen, J.,** delivered the opinion of the court.

Rescission and cancellation are sought by the bill in equity filed by J. H. and A. H. Reed, the appellees herein, against W. D. Corley, the appellant, because of certain material false representations therein alleged to have been made to them by W. D. Corley, whereby they were induced to purchase a section and a half of land, or nine hundred and sixty acres more or less, for a recited consideration of sixty-two thousand, four hundred and ninety-five dollars, none of which was in cash; the consideration being deferred payments and the assumption of a federal loan bank mortgage amounting to twenty

thousand dollars by the Reeds. The false representations were denied in the answer of the appellant, W. D. Corley.

On the trial of the case, the following facts, which are material to state, developed: A short time prior to December 1, 1929, the appellees, the Reeds, approached the appellant, Corley, in Tutwiler, seeking to rent from him his plantation. They lived on and owned the adjoining plantation to Corley's, called "Gulley's Deadening Place," but the appellant, Corley, did not live there, had never done so, but had resided in Colorado. Corley declined to rent his place but told the Reeds that he would sell it to them on easy terms. There were some negotiations, and in one interview with the appellant the Reeds said that he told them: (1) That the boundary of the west side, and especially the northwest corner, was in a designated place; (2) that the lands were well drained; and (3) that there were more than six hundred acres in cultivation on the place. In a conversation Corley stated to the Reeds that they knew more about how much land was in cultivation than he did, as they lived adjoining his place. He further stated to them that they could see the manager of his place, Howell, and go over the land and "see for themselves." The elder Reed went upon the place and made a slight examination. A short time thereafter his son, A. H. Reed, went over the place extensively with the appellant's manager, Howell, and, from the record, made a fairly thorough investigation thereof. After an examination of the place, pursuant to an agreement, the parties met in a lawyer's office to execute the necessary papers to close the transaction, but during this transaction a disagreement arose as to whether the Reeds were to pay certain interest due in February, thereupon Corley declined to consider the matter further and left the office. Afterwards the Reeds went to Tutwiler, where they met the son-in-law of Corley, and they decided "to go back and make the trade."

They said that Corley repeated the statement that "there was better than six hundred acres of land in cultivation on the plantation." Finally, the contract was fully executed by them about December 2, 1929.

The Reeds immediately went upon the plantation and began farming operations for the following year, and very shortly afterwards began clearing land. They did not discover there was any shortage in the cultivated land until November or December of the following year, about the time Corley began to press them for payment of the first note due by them to him. When the note was not paid by them, Corley thereupon caused the lands to be advertised and sold by the trustee on December 26, 1930, at a time when the lands had substantially declined in value.

J. H. Reed stated that he did not suspect there was any shortage in the cultivated lands until the crops turned out to be short. Both appellant and appellees had surveys of the land made. The surveyor for the Reeds testified that at the time the Reeds went into possession there were only about four hundred and fifty-seven acres of land in cultivation, in which statement the Reeds concurred. On the other hand, the surveyor employed by Corley estimated that there were in cultivation, at the time of the execution of the deed, more than six hundred acres of land. There is no evidence that the boundaries of the plantation were not as pointed out; and there was no ground upon which to base the decree of the court below in favor of the Reeds' canceling and rescinding the entire contract and all papers executed between the parties, except upon the representation that there were more than six hundred acres of land in cultivation.

Adopting the theory that there were only four hundred and fifty-seven acres of land in cultivation at the time of the execution of the deed, and that, under the circumstances, the representation was a material one of fact,

and not of opinion, though we do not expressly so decide, may the executed contracts be rescinded and canceled under the facts of this case?

It distinctly appears from the evidence of the Reeds that Corley told them they knew more about the acreage on the place than he did; that there were more than six hundred acres in cultivation; and that they could see his plantation manager, Howell, and go over the place themselves. And in pursuance of this permission, they did, before closing the trade, go upon the plantation and make such investigation as they thought proper. It was certainly not a cursory investigation. Also, it was certain, in the first instance, that the Reeds wanted to rent the place from Corley, and desired to rent five or six hundred acres of land. With that in view, and the fact that when they went upon the place they were investigating with the idea of purchasing same, the inspection made by the younger Reed was not a mere cursory investigation. We must also say that experienced farmers —as they were—when looking at a plantation in the Mississippi Delta, consisting of level lands, should have no difficulty in making up their minds as to the amount of acreage in cultivation and the amount in woodland. The Reeds now say that there were one hundred and fifty acres less in cultivation than represented; so that the evidence warrants the statement that before entering the contract, Reed and his son actually went upon the plantation and saw it themselves, which was the proper manner of ascertaining the truth as to the amount of the acreage; and they had an opportunity there to fully verify or falsify the statements which they testified had been made by Corley to them, and upon which they testified that they relied implicitly in making this contract.

Under these circumstances, we are of opinion that the appellees, the Reeds, were not entitled to a rescission and cancellation of their contract, even if we assume

that the representation was made and that it was false, although the evidence is in sharp conflict on every material point in the case, and the material evidence is confined to that of the parties to the litigation. True, the surveyors testified in accordance with their respective employers, but, after all, due to the fact that the Reeds began to clear land almost as soon as they went upon the plantation, each surveyor relied upon statements made to him by his respective employer as to what lands were cleared and not cleared at the time this contract was made.

We must think that the appellees, at the time of their investigation, decided, on their own judgment, that six hundred acres were in cultivation, notwithstanding they now wholly discard their investigation and testify that they relied on the appellant's (Corley's) statement.

That "actions speak louder than words" is a trite saying, but it aptly fits the revealed actions of the appellees. They made no effort to discover the acreage in cultivation until foreclosure proceedings were begun; they immediately went into possession of the lands; they very soon began to change the situation by putting in cultivation the other lands. They estimated that by September they had cleared three hundred acres. If six hundred acres were already cleared when they took charge of the lands, then in September they had all the lands cleared but sixty acres, when, by their surveyor, they showed more than two hundred acres still uncleared. This discounts their statement. They had much interest in showing a greater amount cleared by them and a lesser amount in cultivation when they took the place over. There is too great a difference.

This case is on all fours with the case of Hall v. Thompson, 1 Smedes & M., page 443, and cannot be distinguished therefrom. In the Hall case the sale sought to be cancelled involved nine hundred acres, and the seller represented to the parties interested that there were not

more than sixty acres unfit for cultivation, whereas it was found, after the contract was executed, that there were three hundred acres unfit for cultivation. In the case at bar, it was represented that there were more than six hundred acres in cultivation, and by the finding of the court below there were only four hundred fifty acres cultivated, and the purchasers examined all the land more than once. Also, in the case at bar, both purchasers examined the land at different times, and made such examination as they desired. They were invited to do so by the owner, and they were unhindered—the landscape was before them. They saw it; there was no concealment, nothing hidden; the view was open and patent. It is unbelievable that having eyes they would not see that the acreage in cultivation on the place was bound to be of prime importance to them. It is evident that they were satisfied, or they would not have consummated the deal. It is pure imagination to say that they did not have full, fair, and open opportunity to inspect, and form their own judgment; and it is absolutely safe to say that they did exercise their own judgment. They were practical dirt farmers; they lived on and cultivated the adjoining lands. Thereafter, when they renewed the negotiations, they were at least upon equal footing with Corley and finally dealt with him at arm's length.

In the Hall case, supra, Judge SHARKEY, speaking for the court said:

"But, admitting that it (the false representation) was made, it will not, under the circumstances, entitle them to relief. It appears that they remained at Thompson's house a week or two, examining land with a view of buying. They examined his tract more than once. It was shown to them by Peele, and by Thompson himself. They state in the bill that they examined the land. Under these circumstances, they must be held to abide by their own judgment. The rule of caveat emptor applies.

When a purchaser has examined an estate which has patent defects that could be discovered by ordinary vigilance, he can have no relief on account of such defects. . . .

"When the party undertakes to examine for himself, it is evidence of a want of confidence, and a determination to rely on his own judgment."

2 Pomeroy's Equity Jurisprudence (4 Ed.), sec. 892, pp. 1849-1851, thus sums up the rules to be applied in order to ascertain when a purchaser is or is not justified in relying upon the representations of the seller: "As a generalization from the authorities, the various conditions of fact and circumstance with respect to the question how far a party is justified in relying upon the representation made to him may be reduced to the four following cases, in the first three of which the party is not, while in the fourth he is, justified in relying upon the statements which are offered as inducements for him to enter upon certain conduct: 1. When, before entering into the contract or other transaction, he actually resorts to the proper means of ascertaining the truth and verifying the statement: 2. When, having the opportunity of making such examination, he is charged with the knowledge which he necessarily would have obtained if he had prosecuted it with diligence: 3. When the representation is concerning generalities equally within the knowledge or the means of acquiring knowledge possessed by both parties: 4. But when the representation is concerning facts of which the party making it has, or is supposed to have, knowledge, and the other party has no such advantage, and the circumstances are not those described in the first or the second case, then it will be presumed that he relied on the statement; he is justified in doing so."

In a very similar situation, the United States Supreme Court, in the case of Farnsworth v. Duffner, 142 U. S. 43, 12 S. Ct. 164, 165, 35 L. Ed. 931, quotes, with approval,

from Pomeroy, supra, the first three statements of the rule in this behalf and reached the same conclusion as to the applicable rule as did Judge SHARKEY in the Hall case supra; Judge Brewer there quoting with approval the following apt language from Slaughter's Adm'r v. Gerson, 13 Wall. 379, 383, 20 L. Ed. 627: "Where the means of knowledge are at hand, and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities he will not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another. And the same rule obtains when the complaining party does not rely upon the misrepresentations, but seeks from other quarters means of verification of the statements made, and acts upon the information thus obtained."

In setting forth Pomeroy's four conclusions in this behalf, the second is left out of view in deciding this case, as the facts of this case render it unnecessary for us to approve or disapprove that conclusion.

Appellees cite many cases decided by this court as to the general rules applicable to material false representations made by the vendor and relied on by the vendee, which are not here in dispute; but the main cases on which they rely are Estell v. Myers, 54 Miss. 174, Vincent v. Corbett, 94 Miss. 46, 47 So. 641, 21 L. R. A. (N. S.) 85, McNeer & Dodd v. Norfleet, 113 Miss. 611, 74 So. 577, Ann. Cas 1918E, 436, and Alexander v. Meek, 132 Miss. 298, 96 So. 101, none of which militate against the conclusion reached by us in the case at bar. The strongest case, and the one on which the case was evidently decided by the court below, is the Alexander

case. In that case the court held that Alexander relied upon the false representation as to a certain boundary and the successful concealment of the true boundary, an inspection of which, by the use of reasonable care and diligence, would not have revealed the shortage in acreage. A map was shown Alexander with no lake noted thereon; on an inspection of the ground he was shown a false boundary which practically excluded the lake, but actually he had bought a substantial percentage of useless lands covered by the waters of the lake. There was a latent defect deliberately concealed from the vendee by the vendor that rendered detection by rasonable inspection practically impossible. The representation as to the true location of the southern boundary line was a material fact inducing false representation.

The case at bar is wholly unlike the above case. Having made their own inspection, without concealment, the appellees knew as much, or more, about the land in cultivation as did Corley, and they cannot now rely on that representation when they did not depend upon it before they consummated the deal. Corley never pretended to be an expert farmer or to have actual or expert knowledge as to the matter in question, never said or did anything by which he concealed from the Reeds any facts that misled them in their inspection. The facts make the case, and there are none here for cancellation or rescission. The evidence must be clear and convincing in order to decree the cancellation of this executed contract. We have assumed the strongest possible facts in support of the decree of the lower court.

In deciding this case, we have left out of view other serious questions presented by appellant.

By its decree the court below awarded the Reeds a cancellation of their entire liability and undertook a restoration of the status quo ante.

The Reeds are not entitled to relief; the cause is reversed, and the bill is dismissed.

Reversed, and bill dismissed.