Mississippi Power Co. *v.* Bennett.

(In Banc. April 29, 1935. Suggestion of Error Overruled June 10, 1935.)

[161 So. 301. No. 31503.]

110

Heidelberg & Roberts, of Hattiesburg, **J. M. Morse**, of Poplarville, and **Wilbourn, Miller & Wilbourn**, of Meridian, for appellant.

112

114

Hathorn & Williams, of Poplarville, for appellee.

116

Argued orally by **R. W. Heidelberg** and **R. E. Wilbourn**, for appellant, and by **C. V. Hathorn** and **E. B. Williams**, for appellee.

**Cook, J.**, delivered the opinion of the court.

Appellee sued appellant in the circuit court of Pearl River county to recover two thousand dollars paid by him to appellant for twenty shares of its six dollar preferred stock, which appellee purchased relying upon certain alleged false and fraudulent representations, promises, and guaranties with reference thereto made to him by the

agents of the appellant who sold him the stock. There was a verdict and judgment in favor of the appellee for the amount sued for, and appellant has appealed.

The declaration, as finally amended, was in two counts. The first count charged, in substance, that in order to obtain funds with which to enlarge and carry on its business, the appellant adopted a fraudulent scheme to beguile the general public into purchasing its stock by representing that after it received the purchaser's money, it would issue and deliver to him "preferred stock in said defendant corporation in a sum equal to the amount of money received by defendant from such persons, and would guarantee to pay such persons six per cent. per annum on such money, and to refund such money or any part thereof to such persons, at any time they desired to have the same refunded to them, and as further inducement to such persons to withdraw their said funds from bank and turn the same over to defendant in exchange for said stock, said defendant falsely and fraudulently represented to such persons that there was no difference in having their money in bank on savings and having the same with defendant, insofar as being able to obtain or withdraw the same for use at any time, if and when such persons should desire to use the same; when, in point of fact, all of said representations and pretended guaranties were then and there false and untrue and defendant knew the same were false and untrue at the time and had no intention of carrying out and performing the same or any part thereof."

It was further charged that in pursuance of the said fraudulent scheme, and with the intent to defraud the appellee out of two thousand dollars, which he then had in bank on savings account at four per cent interest per annum, the agents of appellant falsely and fraudulently represented to him that if he would purchase two thousand dollars worth of its stock, the appellant would "guarantee to pay plaintiff six per cent per annum on

said two thousand dollars and to refund to plaintiff said money or any part thereof at any time plaintiff should desire to have the same refunded to him, and in connection with the aforesaid fraudulent intent and purpose on the part of defendant then and there and thereby to cheat, swindle and defraud plaintiff out of his two thousand dollars the said defendant further falsely and fraudulently represented to plaintiff at the same time that there was no difference in plaintiff having the money in the bank to savings account and in having the same with defendant, insofar as being able to obtain or withdraw the same for use at any time, if and when plaintiff might desire to use the same.''

It was further averred that none of such representations and pretended guaranties were true, and the defendant knew the same were not true, and had no intention at the time or afterwards of carrying out or performing the same or any part thereof; that all said representations and pretended guaranties were material, but were made by the defendant to the plaintiff with the fraudulent intent and purpose of causing the appellee to believe the same to be true, and thereby inducing him to act upon the same; that plaintiff did believe the same to be true, and was thereby induced to purchase said stock; and that appellant appropriated the purchase price thereof to its own use with no intention on its part, at the time or afterwards, of refunding said money or any part thereof to appellee, if and when he should desire to use the same and request a refund thereof.

It was further averred that after appellee purchased the said stock, appellant paid six per cent per annum thereon until October 1, 1933; that on December 30, 1933, it notified appellee in writing that it would not pay the quarterly dividend then due; that thereupon appellee, desiring to use said money, undertook to avail himself of the representations and guaranties of appellant that it would refund the same to him at any time

he might desire to have it refunded; that he then called upon appellant to refund his money, and offered therewith to return the certificates of stock to appellant, and tendered the same; but that appellant refused to return his money and' advised him that it would not refund same, and had no intention of returning it or any part thereof; that appellee then and there and thereby for the first time discovered the alleged fraud; and that he then promptly elected to rescind the contract of sale by suing therein for such rescission.

The second count of the declaration adopted the language of the first, and averred further that the sale of said stock, under the facts alleged, was in violation of chapter 97, Laws 1916 (the Blue Sky Law then in force), and constituted misrepresentations of material facts concerning such stock, and was fraudulent within the meaning of said statute, as construed by the Supreme Court of the state. This count sought recovery of the said sum of two thousand dollars, with interest, but did not ask for an allowance of attorney's fees, in accordance with the provisions of the said act of 1916.

A motion to transfer the cause to the chancery court was overruled, and after the declaration was amended by filing a second count, a demurrer to this count was interposed and overruled. Thereupon a motion for continuance on account of surprise and unpreparedness to plead to the second count having been overruled, the appellant filed pleas of the general issue to each count of the declaration, and gave notice thereunder of evidence which it would offer to sustain special defensive matters therein set forth.

This notice set forth that the stock certificates expressly provided that the said stock was subject to the charter and by-laws of appellant, and that upon receipt of the stock certificates sued on, appellee was "charged with knowledge of all the provisions thereof, and of the charter and by-laws of appellant, and of the rights, privileges,

restrictions and liabilities arising out of appellee's ownership of stock in the appellant company; and that it was the right and duty of appellee to inform and acquaint himself therewith; that under the charter and by-laws, of which appellee so had notice, appellant was without right to purchase or acquire its own stock, except only so far as may be permitted by law, and then only out of surplus and net profits at such price as may be fixed by the board of directors or the executive committee thereof; and that preferred stock, such as that held by appellee, could not be redeemed except upon the affirmative vote of a majority of the holders of the common stock of appellant company; and that the matter of dividends on the stock were likewise controlled and governed by the terms of the certificate, and charter and by-laws of the company, of all of which appellee was charged with notice immediately upon receipt of his certificates; and that the alleged representations, promises or guaranties, with reference to dividends or redemption or repurchase of the stock, or refund of the price paid, were not made; but, if made, were unauthorized and were inconsistent with the charter and by-laws, and the certificates of stock and were with reference to matters controlled entirely by the provisions of the charter and by-laws of appellant, and were such representations as appellee was legally bound to know there was no right to make, and on which appellee had no right to rely."

It was further set forth that if "the alleged representations and guaranties were made (which appellant denied) then immediately upon receipt of the certificates of stock by appellee, appellee was charged with knowledge, and was then and there legally bound to know that the same were inconsistent with the provisions of the charter and by-laws of the appellant, and the terms of the certificate governing the rights, liabilities and status of appellee as a stockholder of appellant company, and then and there had notice and knowledge of the alleged

fraud, and was then and there bound to determine, as of the time of the receipt by appellee of the certificates of stock, whether he would affirm the transactions, and retain the stock, with its benefits and liabilities, or rescind; that appellee failed, within a reasonable time after such notice and knowledge, to rescind the transaction, and ratified and affirmed the transaction, with such knowledge, by continuing to hold and retain the shares of stock as his own property, and to receive and enjoy the benefits thereof, and to receive and retain the dividends thereon, while appellant was continuing to carry on its operations, and incurring obligations and liabilities to creditors and to the public at large, in the course of the discharge of its duties as a public service corporation, upon the faith that appellee was then and there satisfied and willing to continue and remain as a stockholder in the company; and that thereby appellee was and is estopped as against the appellant and its creditors and the public at large, to repudiate the purchase of the stock and his obligations and liabilities incurred as the owner thereof."

Appellant also gave notice that it would offer evidence to show that, on account of business depression, it was forced to suspend payment of dividends on said preferred stock; and that all of appellant's current income is required to operate its business and maintain its properties, and that it does not have income or assets or credit available to obtain funds to meet the demands of appellee and other preferred stockholders for the return of money paid for preferred stock, and to do so would render appellant insolvent and incapacitated to discharge its duty to the public; that it is contrary to the laws and public policy of the state for a corporation to permit any of its capital stock to be withdrawn or diverted from its purposes, or to declare dividends that would render it insolvent; and that appellant is prohibited by statute from doing acts contrary to said laws and public policy, and that to comply with the demands of appellee and others

similarly situated would be contrary to the statutes and public policy of the state, wholly ultra vires and void, and would render appellant insolvent.

In response to this notice, the appellee filed a counter notice denying the contentions of appellant, and also averring that he did not read the stock certificates until he discovered the alleged fraud; that the print on the certificates was so small that it could only be read with the aid of a magnifying glass; that after he discovered the alleged fraud, he had the same read to him with a magnifying glass, but asserted that nothing in the said certificates put him on notice that the alleged representations made to him were in conflict with appellant's charter and by-laws. It was also charged that the majority of the holders of the common stock under the charter and by-laws of appellant had the right at any time to vote to redeem stock such as that held by appellee; and that he had the right to assume that a majority of the holders of the common stock had authorized the redemption of the stock at the time the agent selling it made the alleged representations to him.

Notice under the general issue to the second count set forth substantially the same matters as the notice under the general issue filed to the first count, with the additional averments that neither appellant nor its agents who sold said stock made any misrepresentations of any material facts concerning the same, and that such representations, if any, as were made by appellant and its agents, were made in good faith, and that while appellant made no contract or guaranty as to dividends, other than expressed in said stock certificate and charter and by-laws, appellant did honestly expect to pay such dividends as provided for therein. It was therein further set forth that: "While it made no guaranty or promise to refund the purchase price of such stock at any time, nor to repurchase such stock at any time, or price, it did then and there maintain a resale bureau

through which it could and did resell such preferred stock for its stockholders from time to time at the then market price, less a handling charge, or brokerage fee of two dollars per share; that at the time of the sale of such stock to plaintiff, such preferred stock of defendant was in demand by the public; that the price of said stock on the market showed no material fluctuations; that the defendant, through such resale bureau was able readily to resell for any and all stockholders who requested it, such of their stock as they desire to dispose of, and on very short notice; that the existing conditions of the market for the stock, and the past record and experience of the company, and its financial condition, and earnings, and its prospects and expectations fully justified the expectations that through such resale bureau any of its stockholders who might need or desire to dispose of their stock, could do so promptly, and readily. That defendant has continuously, a long while prior to the sale to plaintiff, and continuously thereafter, maintained and does now maintain such resale bureau for such stock, but that economic conditions became such that there was and is no market for such stock at anything like its true value; that speculators acquired from holders of such stock at sacrifice prices, certain blocks of it, and put it on the market at such low prices as to destroy the chance to realize anything like the real value of the stock and rendered it impossible for defendant to resell for such of its stockholders, who, due to the depression, desired, or found it necessary to dispose of their said stock at any price this defendant could recommend to such stockholders; and that defendant has found it impossible to resell said stock for the large number of stockholders who have desired and requested that their said stock be converted into cash. That while defendant did not agree nor promise, nor represent that it would repurchase the stock of any stockholder, nor refund to any stockholder the money paid for such stock, but nevertheless, as long as the

market made it possible so to do, defendant aided large numbers of its stockholders to convert their stock into cash, through such resale bureau, and stands ready, and willing to do so for all stockholders at all times, provided such stock can be sold at prices satisfactory to such stockholders, and at all.''

By counter notice appellee replied that said stock was in demand only on account of the alleged false and fraudulent representations concerning the same, that the appellant knew it could resell said stock only by making such false and fraudulent representations as were made to appellee, and that the market therefor was destroyed by appellant's failure and refusal to refund the money paid therefor to the purchasers thereof.

There is no substantial dispute in the facts shown by the evidence. R. B. Jordan, an agent of the appellant in the sale of its preferred stock, testified that, during the selling campaign, monthly meetings of the agents and employees of the appellant were held usually at Hattiesburg, Mississippi; that these meetings were for the purpose of instructing the agents in methods to be used in making sales of this stock, and that they were usually presided over by the appellant's vice president and general manager, and that its division manager and other officers were usually, or frequently, present; that at these meetings, these officers instructed them to use three selling points, the language of the witness in respect to this matter being: ''They told us that we had three strong selling points. One was that their money was safe, and second, that it paid a higher rate of interest than an ordinary savings account, and third, that they could get their money whenever they wanted it, and those were the three strong selling points they said we should talk.''

He further testified that they were instructed to guarantee to purchasers six per cent on their investments, and to represent to them that they could get their money back whenever they wanted it, and that if at any time

they were in a hurry for a refund of their money, they could take their certificates to the Gulfport office of the company and get their money. He also testified that in selling this stock, the above-stated selling points were used by him and other agents, and that he knew that appellant maintained some kind of sales organization at Gulfport. On cross-examination, this witness was asked the following question: "Was it explained to you or did you have any definite information about how a person would get his money back if he wanted to sell his stock; whether or not they would take it up and resell it to somebody else or what would be done with it?" The response to this question was: "They didn't say anything about reselling it."

On cross-examination this witness was examined at length in reference to certain sales literature, and there was offered in evidence as exhibits to this testimony the literature in question, including a pamphlet called the "Tell and Sell" book. This "Tell and Sell" book contained the statement that: "No definite date is fixed for the redemption of this stock. Money invested in stock is invested on a partnership basis. It is not loaned to the company. It is intended that the money should remain in the property, which is permanent, and thus be kept continually at work. If the company calls in or redeems the stock, which it reserves the right to do, it agrees to pay one hundred ten dollars and accrued dividend per share," and that the stock might be resold at any time through a resale bureau maintained by the company; but this book and other sales literature was not furnished to prospective purchasers of the stock.

Appellee testified that he had two thousand dollars on savings deposit in a bank, drawing four per cent interest; that he was approached by appellant's local manager at Poplarville, Mississippi, and R. B. Jordan, an employee of that office, in reference to a purchase of appellant's preferred stock; that they represented to him that

an investment of his money in this stock was a better proposition than that of a bank, because it was bigger than a bank, was growing all the time, and that he could get his money at any time he wanted it. Upon being asked whether they told him how he could get his money out of the stock, he replied: "Yes, sir; just take the certificates and carry them to Gulfport and they would cash them and they said, 'or if you don't have time to do that, just go to the office here and Mr. Bostick will send them in for you and they will send your money back.'"

He further testified that they represented to him that a six per cent dividend on the stock was guaranteed, and that he believed these representations, and relied and acted thereon; that he had no reason to suspect that the representations were untrue, or would not be carried out, until he received notice, on or about January 1, 1934, that the quarterly dividend due on that date would not be paid; that upon receipt of this notice, he at once tendered his stock to appellant and demanded a refund of the purchase price thereof, and on being notified by the president of the appellant company that the sale would not be rescinded and the purchase price of the stock refunded, he promptly filed this suit.

Other than the exhibits offered during the cross-examination of appellee's witness R. B. Jordan, the appellant offered no evidence. At the conclusion of the evidence, both sides requested peremptory instructions, which were refused, and thereupon the cause was submitted to the jury upon instructions granted to the appellee.

The appellant contends that the representations relied on reduced themselves to two contractual promises: (1) A promise to pay dividends in the future; and (2) a promise or representation that in future, if and when appellee desired his money back, he could obtain it, the same as he could get it back if it were in a bank, and that

the peremptory instruction requested by it should have been granted for the reason that these alleged contractual promises were not shown to have been made with an undisclosed intention of not performing them.

There is authority holding, and for the purpose of this decision only we will assume, that a guaranteed dividend on preferred stock does not in legal effect guarantee a payment in any event, but only in the event the dividends are earned; and that, consequently, appellee was not entitled to rescind the contract by reason of the breach of the promise to pay dividends in the future.

It is the settled rule that a contractual promise, made with the undisclosed intention of not performing it, is fraud. American Law Institute Restatement, Contracts, section 473; Gross v. McKee, 53 Miss. 536; White v. Stewart, 166 Miss. 694, 145 So. 747; Palmetto Bank & Trust Co. v. Grimsley, 134 S. C. 493, 133 S. E. 437, 51 A. L. R. 42, and authorities cited in the note attached to the report of this case in 51 A. L. R. The appellant does not controvert this rule, but contends that, "as to the promise the representation that in the future, whenever appellee desired his money back, he could apply for it and get it back, and in that particular his investment was like having his money on deposit in a savings account in bank," the proof fails to show an undisclosed intention of not performing it. It is contended, on the contrary, that the fact, as shown by the evidence, that during the time intervening between the purchase of the stock by appellee and his offer to rescind, other parties did surrender their stock and receive their money back, and that the appellant maintained a bureau for the resale of stock, is evidence tending to show an intention to perform the promise.

We do not so construe the probative values of these facts. It is shown that at the time the stock in question was purchased by the appellee, and throughout the period intervening before the filing of this suit, the appellant

did, in fact, maintain in Gulfport, Mississippi, a resale bureau, through the medium of which the stock of any shareholder might be resold, provided there was any market or any demand for such stock. Manifestly, sales of stock through this bureau to the buying public must of necessity have been made at the market price existing at the time the stock was offered for sale, and the existence of this bureau afforded no assurance to stockholders of a return of all their investment. The promise made to appellee, as shown by the uncontradicted proof, was to return him his entire investment at any time he desired a refund of his money. He did not part with his savings upon a promise on the part of the appellant that it would at any time endeavor to resell his stock for him through a resale bureau, or that his money would be refunded by it, provided it could first resell it at par or par and accrued dividends. When the fact developed, as set forth in appellant's pleadings, that there was no market for this stock except at such low prices as to practically destroy the investment, the activities of the resale bureau became a poor substitute for an enforceable promise to refund the money invested in such stock; and it may well be assumed that promises to proposed small investors to aid them in the future in an effort to resell at the prevailing market price would not be nearly so fruitful of sales as an absolute promise to refund the entire purchase price at any time the purchaser wanted his money. An intention to refund at any time the purchaser desired his money is not shown by proof of an intention to do a wholly different thing, which might or might not result in a return of the money, and which, in the case at bar, has resulted in the purchaser being wholly unable to secure his money or any part thereof.

The reasonable and necessary inferences to be drawn from the pleadings and proof in this case lead to the inevitable conclusion that when apparent refunds were made, it was, in fact, accomplished by a resale of the shareholder's stock, and that when resales for the amount

which appellant had obligated itself to refund became impossible, it refused to make further refunds. We think the pleadings and the proof in support thereof clearly show that the appellant had no intention of performing the promise which the uncontradicted proof shows was actually made to appellee at the time he purchased the stock; but that its real purpose and intention was to do a wholly different and inadequate thing, that is, to merely aid purchasers in the resale of their stock by the maintenance of a bureau for that purpose. This substitute for the announced purpose and intention upon which the appellee relied when he parted with his money could only be effective as long as there existed a ready market for the stock at or above par, and did not relieve the appellant of its assumed obligation to refund to appellee the amount he had invested in the stock when he desired his money. Consequently, we think the appellee is entitled to recover the sum so invested, unless he is precluded from so doing by reason of some elements of laches, ratification, or estoppel.

The appellant contends, however, that the promise or obligation to refund the money invested, or repurchase the stock, "at any time" the purchaser desired his money, means within a reasonable time after the purchase; and since appellee retained the stock for nearly four years before offering to rescind and demanding the return of his money, he cannot now recover. In support of its contention that the words "at any time" as used in contracts of this character mean within a reasonable time, the appellant relies on the cases of Grace Securities Corporation v. Roberts, 158 Va. 792, 164 S. E. 700, and Kaplan v. Reid Bros., 104 Cal. App. 268, 285 P. 868. Each of these cases held that in a contract to repurchase stock at any time, the words "at any time" mean within a reasonable time; but that what is a reasonable time in which to exercise the option depends upon the facts and circumstances of the particular case. And in the Grace Securities Corporation Case, supra, it was held that an

exercise of the option more than two years after the purchase was within a reasonable time, while in the Kaplan Case, supra, wherein the company agreed that it would, at any time, on thirty days' notice, return to the purchaser the par value of the stock, with accrued dividends, it was held that a delay of six years was not unreasonable. Also in the case of Vickrey v. Maier, 164 Cal. 384, 129 P. 273, 274, the Supreme Court of California had under consideration a contract for the repurchase of stock "at any time after six months," and held that a delay in making a demand of more than four years after the lapse of the six-month period was not unreasonable.

In the case at bar there are no facts or circumstances which would indicate that either party intended or contemplated a prompt exercise of the right to demand a refund of the money invested. On the contrary, the use of the words "at any time" and the very purpose of the sale of the stock indicated an intention of the parties that the right need not be promptly exercised, and having in view all these facts, we think that in so far as the effect and application of the words "at any time" were concerned, the demand for a return of the money was made within a reasonable time. Furthermore, in view of the fact that appellee acted promptly after receipt of notice that the quarterly dividends due January 1, 1934, would not be paid, which was the first circumstance to create dissatisfaction and cause appellee to desire a return of his money, the holding of the New York Court of Appeals in the case of Fitzpatrick v. Woodruff, 96 N. Y. 561, applies here. In that case, the plaintiff purchased bonds in reliance upon an oral agreement on the part of the defendant that if "at any time" the plaintiff became dissatisfied with them, the defendant would take them back on thirty days' notice and return the money paid with interest. Interest on the bonds was paid semiannually for about two and one-half years, when default was made in the payment thereof, and thereupon plain-

tiff gave the required notice of thirty days and, at the expiration of that time, tendered back the bonds and demanded a refund of the money paid, with interest. While recognizing the general rule that where the time within which an option is to be exercised is not limited or fixed by the agreement, then such option must be exercised within a reasonable time, the court held that since no reason had existed for dissatisfaction up to the time the interest was refused, under these circumstances, the demand was within a reasonable time, and within the above-stated rule.

It is further contended that on receipt of the stock certificates, the appellee was charged with notice of their contents and recitals, and since these certificates did not contain on the face thereof the agreement alleged to have been made, he was under the duty at once, or within a very limited time, to elect whether he would rescind, or keep the stock as permanent investment. We recognize the principle of law that a purchaser of personal property who desires to rescind the sale on account of fraud or mistake is required to act with reasonable promptness after he discovers the fraud or mistake, or is chargeable with notice thereof; but we do not concur in the view that upon receipt of certificates of stock which did not contain the alleged agreement on the part of appellant to refund the purchase money at any time appellee desired, he was thereby chargeable with notice that the promises or representations were untrue, or were made without intention of performing.

Although it has been held that in the absence of fraud in the making of a contract, a party thereto who retains the contract in his possession must be held to a knowledge of the conditions thereof, although he may not have read it, but relied upon the representations of an agent as to the provisions thereof, Germania Life Ins. Co. v. Bouldin, 100 Miss. 660, 56 So. 609, yet the very basis of the case at bar is fraud in the procurement of the con-

tract. In the case of Nash Mississippi Valley Motor Co. v. Childress, 156 Miss. 157, 125 So. 708, 709, wherein the basis of the suit was alleged false and fraudulent representation in procuring a contract of sale, the court said: "A purchaser has a right to rely upon the representations of a seller as to facts within the latter's knowledge, and the seller cannot escape responsibility by showing that the purchaser upon inquiry, might have ascertained that such representations were not true. Contributory negligence is not a defense to an action based on fraud. If a false statement is made by one who may be fairly assumed to know what he is talking about, it may be accepted as true, without question and without inquiry, although the means of correct information are in reach. Ferguson v. Koch, supra [204 Cal. 342, 268 P. 342, 58 A. L. R. 1176]; Gannon v. Hausaman, 42 Okla. 41, 140 P. 407, 52 L. R. A. (N. S.) 519; King v. Livingston Mfg. Co., 180 Ala. 118, 60 So. 143; Fosburg v. Couture, 126 Wash. 181, 217 P. 1001, 1002.''

Aside from any question as to the effect of recitals printed on a certificate of stock in type so small as not to be readable without the aid of a magnifying glass, as the uncontroverted proof here is, under the rule announced in the Childress Case, supra, the fact that the appellee had in hand the means of correct information and did not read it, but relied on false and fraudulent representations of the seller's agent, does not relieve the seller of responsibility. This is said in reference to the fact that the stock certificates did not contain the alleged agreement to refund at any time, but it applies equally to the affirmative recitals of the certificates. In addition to that, however, we find nothing in the recitals of the certificates that would charge the appellee with notice of the falsity of the promises and agreements which induced him to purchase the stock, or that such a contract on the part of the appellant was ultra vires.

In the lengthy recitals attached to and forming a part

of the stock certificates, the corporation expressly reserved the right, upon the affirmative vote of the majority of the common stock outstanding, to redeem the six dollars preferred stock upon the payment therefor of one hundred ten dollars, plus all accumulated and unpaid dividends. But this right to redeem reserved to the corporation would not charge the purchaser of stock with notice that the right to redeem the particular stock at par had not been granted by the common stockholders, or that his promised option to call his stock and demand his money at any time would not be recognized. Since, as we hold, there was nothing to charge the appellee with notice of the alleged fraud, or to put him on inquiry, until he was notified on January 1, 1934, that the dividend then accrued would not be paid, his failure to demand a rescission before that time did not affect his rights, upon receipt of this notice he at once offered to rescind, and upon being met with refusal promptly filed this suit. Under these circumstances, there was no default or delay which precludes recovery.

Appellant also seems to contend that since it was organized under the laws of the state of Maine, and the stock certificates issued to appellee contained the provision that it was issued subject to the laws of Maine, upon receipt of the certificates, appellee was charged with notice and knowledge of the laws of that state affecting the issuance of the stock, and the binding force of the alleged agreement to refund, or redeem the stock at any time. As touching this contention numerous statutes of the state of Maine are cited and quoted in the brief of counsel for the appellant, as well as in the dissenting opinion herein, but it is not pointed out wherein any of these statutes have any bearing upon the question involved, except probably those hereinafter noted.

Section 20 of chapter 56 of the Revised Statutes of Maine 1930 provides that no preferred stock shall be "called in or retired if thereby the property and assets

of the corporation shall be reduced below the amount of its outstanding debts and liabilities.'' There is not a scintilla of proof in this record showing or tending to show that the retirement of the stock sold under the alleged agreement would reduce appellant's property and assets below the amount of its outstanding debts and liabilities; and, consequently, the prohibition of this statute cannot affect appellee's rights.

Section 37 of chapter 56, Rev. St. Maine 1930, as amended by laws of 1933, chapter 53, provides that, ''Dividends of profit may be made by the directors, but the capital shall not thereby be reduced, until all debts due from the corporation are paid, . . .'' while section 93 of chapter 56, Rev. St. Maine 1930, provides that, ''Corporations, not created for literary, benevolent, and banking purposes, shall not so divide any of their corporate property as to reduce their stock below its par value, until all debts are paid.'' And section 101 of said chapter also provides that the capital stock subscribed for any corporation shall stand for the security of creditors and shall be paid for in cash or its equivalent. The rights of creditors are in no way involved in this case, and the record is wholly barren of any evidence that would show that appellee's rights were in any way affected by the provisions of any one of the last above-mentioned statutes.

Section 102 of the said section 56, Rev. St. Maine 1930, provides as follows: ''Sec. 102. *Withdrawal of capital stock, void as against judgment creditor, receivers, or trustees.* . . . No dividend declared by any corporation from its capital stock or in violation of law, no withdrawal of any portion of such stock, directly or indirectly, no cancellation or surrender of any stock, and no transfer thereof in any form to the corporation which issued it, is valid as against any person who has a lawful and bona fide judgment against said corporation, based upon any claim in tort or contract or for any penalty, or as against

any receivers, trustees, or other persons appointed to close up the affairs of an insolvent corporation.''

In connection with the discussion of these statutes, our attention is also called to the case of Spear v. Rockland-Rockport Lime Co., 113 Me. 285, 93 A. 754, 6 A. L. R. 793, wherein the Supreme Court of Maine held that as to creditors, a preferred stockholder's rights are subordinate, and that he cannot claim dividends out of funds that are needed for, or that properly should be applied to, the payment of debts. As hereinbefore pointed out, the rights of creditors are not here involved; and there is no proof whatever showing that any of the requirements or prohibitions of the cited statutory provisions of the state of Maine have any application here, or in any way militate against appellee's right to rescind.

There was no reversible error in any of the rulings of the court on the preliminary motions and pleadings; and upon the testimony of the appellee, which is corroborated in all material respects by the testimony of one of the agents who negotiated the sale of the stock in question, we think he was entitled to a peremptory instruction on the first count of the declaration. Consequently, other alleged errors in the admission or exclusion of testimony and in the instructions granted to appellee become immaterial.

The judgment of the court below will therefore be affirmed.

Affirmed.

**Ethridge, J.,** delivered a dissenting opinion.

I am unable to agree with the opinion of the majority in this case. As I understand it, they base their opinion upon the theory that the plaintiff was entitled to a peremptory instruction under the common-law count, and they eliminated from their consideration the count under the Blue Sky Law.

■ I do not think the plaintiff's statement and the evidence of his witnesses warranted the inference of fraud in procuring the contract. .

■ I am of the opinion that, even if fraud was sustainable under the evidence, when the certificate of stock was delivered to the plaintiff, which was two or three days after the subscription therefor, and the giving of the check, he was put upon notice that the contract delivered was not the contract which he had made, and he was under the duty within a reasonable time to rescind the transaction, and demand the return of his money.

The statement upon which the plaintiff predicated his action is as follows:

"They were there and laid the proposition down to me and said what a good proposition it was and everything and said, 'You've got your money in the bank and this is a better proposition than the bank because it pays you more money; it pays you four times a year or quarterly six per cent' and so I looked it over and I said, 'I think myself it is pretty good' and they told me, 'Why, it's a better proposition than the bank is because it is bigger than a bank and it's growing all of the time and you can get your money out of it at any time you want it.' "

"Q. Did they tell you how you could get your money out? A. Yes, sir, just take the certificates and carry them to Gulfport and they would cash them, and they said, 'Or, if you do not have time to do that, just go to the office and Mr. Bostick will send them in for you and they will send your money back.' "

He testified that the parties making the negotiations were Messrs. Bostick and Jordan, of the Mississippi Power Company, and that he believed what they said and relied upon them.

Mr. Jordan testified that the general manager of the sales department of the Mississippi Power Company, Mr. Armstrong, instructed the agents as to selling points, and among other things stated as follows:

"Q. What representation, if any, did he authorize you to make toward the selling of this stock to the people in this territory? . . . A. They told us that we had three strong selling points. One was that their money was safe, and second, that it paid a higher rate of interest than an ordinary savings account, and third, that they could get their money whenever they wanted it, and those were the three strong selling points they said we should talk. . . .

"Q. Did they tell you who could give them the money? A. No, sir, they just said take it to the Gulfport office.

"Q. And what would happen when they took it there? A. They would get their money back."

It will be seen from this testimony that the representations were as to the future, and not representations of existing facts. In order to predicate fraud upon a future representation, the proof must show that there was no intention, at the time of making such representation, of carrying it out. It is not a breach of a contract based on representations as to the future that constitutes fraud, but it is the fraudulent intent existing in the mind at the time not to perform the contract. While proof of a fraudulent intent may be inferred from circumstances, such circumstances must be inconsistent with honest intention and good faith. Fraud is never presumed, but must be proven by clear and convincing testimony. In 27 C. J., p. 65, it is said: "The facts and circumstances proved must clearly establish the inference of fraud; it is not sufficient that they lead only to a suspicion thereof, nor are they sufficient where they are as consistent with honesty and good faith as with fraud. When the proved or admitted facts are consistent with any reasonable theory of good faith and honest intent, they should be so construed. Fraud cannot be inferred or presumed from ambiguous evidence."

In Willoughby v. Pope, 101 Miss. 808, 58 So. 705, 706, it was held as follows: "Circumstances were given in

evidence which might have raised a suspicion; but suspicion does not rise to the dignity of proof. It has grown to be the fashion to view the acts of our fellowmen with suspicion and distrust. According to the tenets of this cynical school of thought, fraud should be presumed wherever fraud is suggested. This transitory mental attitude does not meet with the approval of this court, and, as it appears to us this rule of action was adopted as a rule of law upon the trial of this case, we cannot approve the verdict of the jury upon this branch of the case.''

In Sawyer v. Prickett, 19 Wall. (86 U. S.) 146, 160, 22 L. Ed. 105, in discussing the question of fraud, the court said that: ''The law gives a different effect to a representation of existing facts, from that given to a representation of facts to come into existence. To make a false representation the subject of an indictment, or of an action, two things are generally necessary, viz., that it should be a statement likely to impose upon one exercising common prudence and caution, and that it should be the statement of an existing fact. A promissory statement is not, ordinarily, the subject either of an indictment or of an action. [Citing authorities.] The law also gives a different effect to those promissory statements based upon general knowledge, information, and judgment, and those representations which, from knowledge peculiarly his own, a party may certainly know, will prove to be true or false.''

In Deshatreaux v. Batson, 159 Miss. 236, 131 So. 346, 348, it was held that such statements are generally mere expressions of opinion, or judgments which will not excuse the other party's failure to make examination for himself for the purpose of ascertaining the real facts. The court there said that: ''The general rule is that a person has no right to rely on representations as to value; he is required to exercise his own judgment as to value. It is an act of folly on his part to accept the other person's statement in that respect. Such statements are usually

mere expressions of opinion, or judgment, which will not excuse the other party's failure to make an examination for himself for the purpose of ascertaining the real facts. This is especially true where the relation of the parties are naturally antagonistic, such as buyer and seller. Where the means of information are equally accessible to both parties, expressions of opinion, however positive, by one of the parties, cannot be considered as a fraud upon the rights of the other,'' citing authorities.

In Walker v. Mobile & O. R. Co., 34 Miss. 245, Walker subscribed for stock, upon the statement of the agent that Congress had donated a large quantity of land to the railroad from which millions of dollars could be realized, but failed to pay for the same. Two grounds of defense were set up in the pleas, and in the discussion as to the second plea, the court there said: ''The defence set up by the second plea consists of alleged fraudulent representations and acts in several particulars. First, as to the representations in relation to the value of the lands donated by Congress, they must, from the nature of the subject, have been mere expressions of opinion upon a matter of which the agent could not possibly have any precise knowledge, or anything more than a mere opinion. The means of information were equally accessible to both parties; and the expressions of opinion, however positive, by the agent, cannot, under such circumstances, be considered as a fraud.''

In Saffold v. Barnes, 39 Miss. 399, the court said, in discussing the alleged false representation, that:

''The alleged false representations relied on by him to discharge him from his subscription are, that the boat was, at the time of his subscription, being built in New York, and was to be ready for the business of the company in May and ready for the summer trade; to be a first-class iron steamboat, to run from New Orleans to Biloxi in six or seven hours, and sufficient to do all the business; but that the boat did not arrive at New Orleans

until August or September, was an inferior boat, could not make the trip from New Orleans to Biloxi in less than eight or nine hours, cost thirty or forty thousand dollars more than was represented by the agent of the company obtaining the subscriptions; that the agent in taking the subscriptions, stated that, unless these representations were fulfilled, the garnishee would not be required to pay his subscription; and that the boat was destroyed by blowing up the first year.

"It is obvious that the subscriptions for stock were the means by which the president and directors were to make contracts for the building or purchase of boats for the enterprise, and to pay for them; and to that end the subscribers had become parties to the enterprise, agreeing to contribute the sums subscribed by them respectively, and clothing the corporation with power and discretion 'to do all proper things for the successful prosecution of the business of the company.' The representations, though alleged to be false, appear from their nature to amount to but this: that the boat was not delivered at the time stated by the agent, and was not of the character and quality represented when the subscriptions were obtained. If this be true, it might have been good ground for the company to refuse to accept the boat; but, as she was accepted, is it a sufficient ground to absolve the subscribers from liability? It appears not. The acceptance was the act of the subscriber's own agent, acting in pursuance of the general authority conferred; and if that agent did not faithfully or judiciously perform the duty, are the creditors of the company to lose their rights acquired against them, as the constituents of the company? The creditors had the right, in making contracts with the company, to regard the subscriptions as their security for the debts contracted in furtherance of the enterprise; and any private understandings between the individual corporators, as to the manner in which the president and directors were to perform the duties

required of the corporation, and in derogation of the general powers conferred upon them in the articles of incorporation, was a matter which could not affect the rights of parties dealing with the corporation, within the scope of its articles of incorporation.''

In 51 A. L. R., pages 1 to 177 [Russell v. Industrial Transportation Co., 113 Tex. 441, 251 S. W. 1034, 258 S. W. 462; Bushnell v. Elkins, 34 Wyo. 495, 245 P. 304; Foster v. Dwire, 51 N. D. 581, 199 N. W. 1017; Councill v. Sun Ins. Office, 146 Md. 137, 126 A. 229; Holcomb & Hoke Mfg. Co. v. Auto Interurban Co., 140 Wash. 581, 250 P. 34; Palmetto Bank & Trust Co. v. Grimsley, 134 S. C. 493, 133 S. E. 437], fraud is discussed, and in an elaborate case note beginning at page 46, there is a general discussion upon the proposition, citing many authorities. On page 63 it is said that: ''When a promise is made, the promisor, by necessary implication, asserts a present and bona fide intention to perform, and if, therefore, the intention to perform does not exist, there is a misrepresentation of a fact upon which fraud may be predicated, the gist of the fraud in such a case being not the breach of the agreement to perform, but the fraudulent intent of the promisor, and the false representation of an existing intention to perform, when such intent did not, in fact, exist; and the courts have pointed out that the state of the promisor's mind at the time he makes the promise is a fact, and one which is exclusively within his own knowledge; and if he represents his state of mind, i. e. his intent, as being one thing, whereas it is the opposite, he misrepresents a then existent fact. In other words, there is a prima facie presumption of fairness and honesty in the dealings of individuals, and where one makes a promise to another as an inducement for a change of position, or other action on the part of the latter, he, if not expressly, impliedly avers that he has an existing intent to fulfill his promise, and such implied averment of existing intent is one of matter of fact, and

if false and fraudulent, is a fraudulent representation which may or may not according to circumstances, furnish the basis for an action ex delicto in the nature of deceit.''

Measured by these rules, there is not sufficient evidence to establish an intent not to perform, in the case at bar, at the time the contract of subscription was made. The contract was made in January, 1930, and the stock certificate was delivered in January, 1930, and the six per cent quarterly dividends were regularly paid up to and including October, 1933; the January, 1934, being the first dividend left unpaid, because of financial difficulties due to the great depression. Numbers of subscribers had availed themselves of the privilege of the resales agency established by the company, and a number of witnesses were introduced, who testified that they had taken their stock to the company and secured cash therefor. It is clear that this resale agency was established and existent at the time of the subscription, and that the company was then able to dispose of all stock returned, and that money for such returned stock was sent by the company to each such purchaser. This, it seems to me, instead of establishing a fraudulent purpose, establishes conclusively a bona fide intention on the part of the appellant to carry out its agreement.

It is also clear that the reason for the later inability and failure to perform was the financial distress then existing, during which it was impossible to sell stock or to borrow money. It is significant that the power company continued to pay the six per cent dividends during the financial distress. It is not a case where the company had no means of carrying out its promise at the time it was made; but, on the contrary, it is a case where the company carried out its agreement to pay the six per cent dividend, and to comply with the desire of a number of its subscribers to have their stock resold through its resale agency.

In the case at bar there were no representations made

by an agent as to what plan or method the company would use in refinancing sales of stock, or in refunding money given therefor.

It seems to me to be manifest that if a person is to be credited with general knowledge of the law—and we must so assume in administering the law—that the resale agency was the only feasible means of carrying out the contract, and that the parties must have had some understanding thereof. A contract to do an unlawful thing, of course, is not enforceable, and parties having knowledge of such must know that the company cannot make valid and legal such a contract.

The appellant, on receiving the stock certificate which did not contain the agreement alleged to have been made, was under the duty, at once or within a short time, to elect whether he would keep the contract as given him, or whether he would rescind it, and demand the return of his money. Under notice of special matter under the general issue, the plaintiff was given notice that the stock certificate sold to him contained the provision that it was subject to the laws of Maine, and to all the provisions of the contract. The certificate of stock showed on its face that the preferred stockholders had different rights from the common stockholders, and that the seven per cent preferred stock had prior rights to the six per cent common stock; and of course plaintiff was bound to take notice of the charter of incorporation and the laws of the state under which the corporation was created. The stock certificate contained provisions which expressly referred purchasers to that information, or to where it could be obtained; and they were bound to accept the stock under the laws of the state of the corporation's domicile. There are a number of statutes of the state of Maine, under which the power company was created, of which stockholders must take notice. It may be true that a person actually does not know what the law is, but in dealing with corporations of other states, and of this

state, a person must take notice of their power under the law. Such persons are charged with the duty of ascertaining what the law is with respect to the powers and duties of such corporations, and all pertinent provisions growing out of same. If a person makes a contract in another state, he necessarily makes it subject to the laws of that state, and he must be charged with knowledge of the laws thereof, whether he has actual knowledge or not.

It appears that by the law of Maine, under which the corporation in the case at bar was created, stock may be issued under such provisions without a par value; "it shall be unlawful to set forth any par value or value in dollars thereon, or to express any rate of dividend to which the shares represented thereby shall be entitled in terms of percentage of any par or other value. Every such certificate shall have plainly stated on its face the number of shares which it represents and each such share (except as to preferences, rights, limitations, privileges, and restrictions, lawfully granted or imposed with respect to any stock or class thereof) shall be deemed to be equal to every other share of the same class. Preferences, rights, limitations, privileges, and restrictions authorized by the laws of this state may be stated in dollars and cents per share." Section 14.

Section 14, art. 4, pt. 3, Const. Maine 1930, provides that: "Corporations shall be formed under general laws, and shall not be created by special acts of the Legislature, except for municipal purposes, and in cases where the objects of the corporation cannot otherwise be attained; and, however formed, they shall forever be subject to the general laws of the state."

Section 17, chapter 56, Rev. St. Maine 1930, provides that: "Every corporation may create two or more kinds of stock with such classes and with such designations, preferences, and voting powers, or restrictions, or qualifications thereof, as shall be fixed and determined in the

by-laws, or by vote of the stockholders at a meeting duly called for the purpose. Restrictions and qualifications of voting power so imposed shall control in all cases where any vote or consent of stockholders is now or hereafter required by statute, unless such statute shall provide expressly to the contrary, and the provision of any statute requiring a specific vote of all, a majority, or a fractional part of the stock issued or of the stock outstanding, or any similar provision, shall be construed as limited by any such restrictions and qualifications.''

Section 19, chapter 56, Rev. St. Maine 1930, further provides that: ''Corporations may issue and dispose of their authorized shares having no par value for such consideration as may be prescribed in the certificate of organization or in the certificate of amendment, or if no consideration is so prescribed then for such consideration as may be fixed by the stockholders at a meeting duly called and held for the purpose, or by the board of directors when acting under general or special authority granted by the stockholders.''

Section 20, chapter 56, Rev. St. Maine 1930, provides for the retirement of preferred stock, and provides: ''That no preferred stock shall thus be called in or retired if thereby the property and assets of the corporation shall be reduced below the amount of its outstanding debts and liabilities.''

The pleadings and the record show that a repurchase of all the stock would diminish the assets of the corporation below its outstanding debts and liabilities, and consequently this provision in the contract limited the plaintiff's right to recover, and the action on this proof should not be sustained.

By section 93, chapter 56 of the Revised Statutes of Maine 1930, it is provided that: ''Corporations, not created for literary, benevolent, or banking purposes, shall not so divide any of their corporate property as to reduce their stock below its par value, until all debts

are paid, and then only for the purpose of closing their concerns.''

Section 101, chapter 56 of the Revised Statutes of Maine 1930, provides as follows: ''The capital stock subscribed for any corporation is declared to be and stand for the security of all creditors thereof, and no payment upon any subscription to or agreement for the capital stock of any corporation, shall be deemed a payment within the purview of this chapter, unless bona fide made in cash, or in some other matter or thing at a bona fide and fair valuation thereof.''

Section 102 of chapter 56 of the Revised Statutes of Maine 1930 provides that: ''No dividend declared by any corporation from its capital stock or in violation of law . . . is valid as against any person who has a lawful and bona fide judgment against said corporation, based upon any claim in tort or contract or for any penalty, or as against any receivers, trustees, or other persons appointed to close up the affairs of an insolvent corporation.''

Section 14, art. 4, pt. 3, of the Constitution of Maine provides that: ''Corporations shall be formed under general laws, and shall not be created by special acts of the Legislature, except for municipal purposes, and in cases where the objects of the corporation cannot otherwise be attained; and, however formed, they shall forever be subject to the general laws of the state.''

It is manifest from these provisions of the law of Maine that in the case at bar the plaintiff was under the duty at once either to retain or repudiate the contract delivered to him. On the duty to promptly rescind, it is said, in 13 C. J., p. 611, that: ''One induced by fraud to make a contract may on discovery of the fraud either affirm the contract and sue for damages, or assert them by way of counterclaim, or he may repudiate the contract, tender back what he has received under it, and recover what he has parted with, or its value, even in the

hands of third persons, unless they are bona fide purchasers for value, without notice of the fraud, but the adoption of one remedy excludes the other." See Alig v. Lackey, 114 Miss. 392, 75 So. 139.

In Black on Rescission and Cancellation, vol. 1, p. 47, sec. 24, it is said that: "There must also be an intention that the fraud practiced shall influence the action of the other party, and there must be the fact that it did influence him and induced him to enter into the contract or obligation."

It is not permissible for a person to take a written contract which, under the law, is the exponent of its own terms, and neglect or refuse to limit himself to its provisions, and then, after a long delay, having received benefits under it, to repudiate it upon the ground that he did not know its terms. A contract cannot exist in parol and in writing at one and the same time. The plaintiff must exercise reasonable diligence to determine whether the contract complied with the agreement. He had the contract in his possession in ample time to become acquainted with its provisions.

In 13 C. J., title "Contracts," p. 616, sec. 671, it is said: "A party seeking to rescind for fraud or false representations must do so within a reasonable time; and the right is lost by failure to act promptly on discovery of the fraud or after it might have been discovered by the use of due diligence. And it would seem that although delay is induced by additional fraudulent representations the party cannot thereafter take advantage of the original fraud as a ground for rescission. So in equity, unreasonable delay in taking steps to set aside a fraudulent contract will have the effect of affirming it."

In section 542, Second Edition, Black on Rescission and Cancellation of Contracts, vol. 2, p. 1336, it is said: "The purchaser of personal property who desires to rescind the sale on account of fraud, mistake, defective quality, or other cause, is required to act with reasonable promptness.

It is, of course, impossible to fix an absolute limit of time within which such action must be taken, as each case must be governed by its own circumstances. But from an examination of the authorities it would appear that thirty days is about the utmost length of time which the courts are disposed to allow to the purchaser for this purpose, unless there are unusual circumstances in the case excusing a longer delay. At any rate, periods of time ranging from one month to a year have been held too great to save the party attempting to rescind from the imputation of laches, while, on the other hand, purchasers who have rescinded the sale within periods extending from one day to thirty days have been held to have acted with reasonable promptness. In a case in Delaware, it is said that a reasonable time within which to rescind a sale for fraud and return the goods, where the parties live not more than fifteen miles apart, would be one or two days after discovering the fraud, and in a case where the subject of the sale was certain hay and straw, which was found to be of poor quality, it was held that a delay of six days in rescinding the sale was unquestionably great, and in another case a buyer of silverware was adjudged guilty of unreasonable delay, who waited six weeks before repudiating the sale on the ground that the goods did not class with the sample. So where lumber is sold under a false representation that it is sound, and the buyer makes no objection until nearly three months after discovering its quality, it is too late to rescind. And a similar ruling was made in a case where an inferior grade of whiskey was substituted for that supposed to have been sold, but the buyer made no complaint for two years after discovering the situation.''

See Columbia Milling Co. v. Russell Co., 89 Miss. 437, 42 So. 233; Germania Life Ins. Co. v. Bouldin, 100 Miss. 660, 56 So. 609; Home Mut. Fire Ins. Co. v. Pittman, 111 Miss. 420, 71 So. 739; Corley et al. v. Reed et al., 164 Miss. 678, 145 So. 241; American Oil Co. v. Williamson, 154

Miss. 441, 122 So. 488; Gunter v. Henderson Molpus Co., 149 Miss. 603, 115 So. 720; Continental Jewelry Co. v. Joseph, 140 Miss. 582, 105 So. 639; J. B. Colt Co. v. Fuller, 144 Miss. 490, 110 So. 427; Springfield F. & M. Ins. Co. v. Nix, 162 Miss. 669, 138 So. 598.

Many other authorities to the same effect could be cited, and many are contained in the briefs filed; but it is deemed unnecessary to set them forth with greater elaboration.

I am also of the opinion that it was error to permit the introduction of evidence of the representations made by other agents to other purchasers of stock. Lindsey v. Lindsey, 34 Miss. 432; Rex Motor Car Mfg. Co. v. Dupont, 132 Miss. 504, 96 So. 684; Clopton v. Cozart, 13 Smedes & M. 363; 23 Cent. Dig. Fraud, sec. 17. There was no relation between what representations other agents made to other buyers of stock and the representations involved in the case at bar. No notice of such representations is shown to have come to the knowledge of Bennett, or to have influenced him in the purchase of his stock. It was an effort to corroborate by hearsay evidence the plaintiff and his witnesses as to their evidence.

The case should have been tried upon the representations made and relied on in the present case, and the other witnesses to other transactions could only have a prejudicial effect upon the minds of the jury trying the case.

For the errors mentioned, I think the judgment should be reversed and the cause remanded.