# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-02353-SCT

*ANDREW EARL CREELY, SR.*

*v.*

*C. DELBERT HOSEMANN, JR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/09/2003 |
| TRIAL JUDGE: | HON. JON M. BARNWELL |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ROGER M. TUBBS |
| ATTORNEYS FOR APPELLEE: | DAVID W. MOCKBEE |
| | JASON EDWIN WEEKS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 02/10/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J.,  GRAVES AND DICKINSON, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.　This is an option contract case in which we must determine whether the optionee, C. Delbert Hosemann, Jr., properly exercised his option to purchase from the optionor, Andrew Earl Creely, Sr., an undivided half interest in approximately 150 acres of what apparently must be prime duck hunting land.

## BACKGROUND FACTS AND PROCEEDINGS

¶2.　On September 11, 1999, Johnny Rayburn entered into a Contract and Agreement to purchase 1,142 acres of land from Dan O'Neal and E.C. Stewart, Jr.  Rayburn later assigned his interest to Creely.  Six days after the assignment to Creely, Danmar, Inc. and Stuart Company

entered into a contract to sell[1] Buck Ridge Hunting Club of Mississippi, Inc.,[2] the same property. When Creely learned of the Buck Ridge contract, he and Rayburn filed a Complaint for Temporary Restraining Order, Permanent Injunction and Specific Performance of Contract against Dan O'Neal[3]; E.C. "Sonny" Stuart, Jr.; Danmar, Inc.; and Stuart Land and Timber, LLC, to prevent the sale.

¶3.    On October 5, 1999, prior to the TRO hearing, Creely and Hosemann reached a compromise. In exchange for releasing his claim under the Buck Ridge contract, Hosemann received an option from Creely to purchase a one-half undivided interest in the portion of the 1,142 acres known as "The Scatters." The option agreement stated:

> In consideration of Hosemann's release of any contract rights to Buck Ridge Hunting Club and termination of his Contract to Purchase same, Earl Creely, an individual resident of Tupelo, Mississippi and Delbert Hosemann, an individual resident of Jackson, Mississippi agree as follows:
>
> 1.    Creely grants Hosemann an Option to Purchase an undivided one-half interest in that certain 154 acres located in the "Scatters" portion of Buck Ridge, a legal description of Buck Ridge is attached hereto for the sum of Fifty Three Thousand Nine Hundred Dollars ($53,900.00) to be paid in cash at closing.

---

[1]The contract was signed by Dan O'Neal, on behalf of Danmar, Inc. and E.C. Stuart, on behalf of Stuart Company.

[2]The sole shareholder of Buck Ridge Hunting Club of Mississippi, Inc., was Hosemann, who is also a tax attorney.

[3]Various documents have spelling variations of Dan O'Neal (O'Neal, O'Neill, O'Neil), however, we will use O'Neal throughout this opinion.

2. Said Option is to be exercised by November 25, 1999 or later if Creely closes purchse (sic) of the property after November 25, 1999.[4]

3. Creely will convey this property interest by Warranty Deed.

4. The Warranty Deed is to reflect a right of first refusal in favor of both Creely and Hosemann in the event of the sale of the property to anyone outside of the parties' immediate families.

5. For so long as Creely or his immediate family owns the Buck Ridge property, Creely agrees to allow Hosemann and his children, Charles Delbert Hosemann, III, Mark M. Hosemann and Kristen C. Hosemann (and their invited guests in their presence) to duck hunt only on that certain eastern part of the Buck Ridge property beginning with and including Twin Lake and east to the property line.

6. Taxes, federal program payments and all other income or expenses will be divided as the parties' interest may appear.

WITNESS the signatures of Creely and Hosemann on this the 5th day of October, 1999.

¶4.     As a result of the compromise, the suit was dismissed, and Danmar, Inc., and Stuart Land and Timber, L.L.C., executed a release of real estate purchase and sale agreement in favor of Buck Ridge Hunting Club and Hosemann.  Hosemann and Creely agreed to have attorney Donny Brock close the Creely-Hosemann Option.  Brock was the attorney who had closed Creely's purchase of the 1142 acres.

¶5.     On November 23, 1999, Hosemann wrote Creely a letter which stated:

I'm sorry I missed you by telephone today.  As you know, we were hoping to have closed by November the 25th.  However, we have been unable to obtain a legal description.  I have requested Butch Montgomery, who did the original survey, to provide us with a legal description for the conveyance.  He asked me where the line should be drawn on the land.  I asked him to draw the line at the approximate normal water level and not at the top of the bank.  This was our understanding when we first discussed this matter in Greenwood.  This would,

[4]Creely closed on October 14, 1999.

3

in essence, provide me with a half interest in the water property only and not in any of your other land. Neither Butch nor I are confident of exactly what the final acreage will be. If it is more or less than the 154 acres we anticipated, we will adjust by the $700.00 per acre agreed price.

Butch telephone (sic) me today and hopefully will complete the survey tomorrow, Wednesday, November 24th. As soon as the legal description is prepared I will prepare a Warranty Deed for your review and we can complete the closing.

I am looking forward to seeing you this weekend.

¶6.    On that same day, Hosemann sent a second letter to Creely which included the following:

Enclosed please find a map as prepared by Robert A. Montgomery, Jr. of our land in Money, Mississippi. It reflects 140.68 acres. . . .  I also have a copy of an aerial photograph I ordered for you of your property. . . . I am also enclosing a copy of his bill for $740.00. I have already sent Robert a check for $370.00 as my portion of the bill.. . . .

How would you prefer the deed to be prepared? Would you prefer for your lawyer to do it or for me to make a first draft?

¶7.    After these letters were sent, Hosemann, Creely and Brock exchanged numerous documents including correspondence, draft deeds, and a limited liability agreement draft, which were pertinent to the sale of property by Creely to Hosemann. Additionally, the following activities took place:

(1)    Hosemann and Creely shared the cost of building an access road to the Scatters.

(2)    They hunted the Scatters together during the 1999-2000 duck season.

(3)    They shared the cost of a Mississippi Department of Environmental Quality survey.

4

¶8.     On September 5, 2000, Hosemann tendered the purchase price to Brock, who placed it into a trust account. However, on December 6, 2000, Creely wrote Hosemann a letter stating: "As of this time I do not wish to sell the property located in McIntyre Scatters. If this should change, I will be in touch."

¶9.     On September 21, 2001, Hosemann filed this suit in the Leflore County Chancery Court against Creely seeking specific performance of the option contract. Creely filed a counterclaim alleging misrepresentation and fraud. At the conclusion of the trial, the Chancellor issued his Findings of Fact and Conclusions of Law and soon thereafter entered a final judgment in favor of Hosemann on both the complaint and the counterclaim. The Chancellor ordered specific performance of the option contract. It is from this judgment that Creely now appeals.

## ANALYSIS

¶10.    On appeal Creely raises the following issues for our review:

    I.     The Hosemann claim must fail for lack of consideration based on misrepresentation.

    II.    The Hosemann claim must fail because a modification of a written contract must be supported by new consideration.

    III.   The Hosemann claim must fail because Hosemann failed to exercise the Option.

    IV.   Hosemann's seven counter-offers extinguished the Option.

    V.    Hosemann's claim must fail because changes, if any, to the Option contract were not in writing and violated the Statute of Frauds.

¶11.    We employ a limited standard of review when reviewing the decision of a chancellor. *McNeil v. Hester*, 753 So. 2d 1057, 1063 (Miss. 2000). "The findings of a chancellor will not

be disturbed on review unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard. *Id.* "The standard of review employed by this Court for review of a chancellor's decision is abuse of discretion" *Id.* "However, for questions of law, the standard of review is de novo." *Id.*

## I. Consideration.

¶12. It is surprising that Creely says Hosemann provided no consideration for the option agreement. He bases this argument on his belief that he would have prevailed in the litigation involving the two contracts for the purchase of the 1,142 acres. Since Hosemann's contract was unenforceable, he argues, Hosemann gave up nothing by settling the litigation. This theory, if valid, would lead to the inescapable conclusion that virtually every settlement could be set aside for lack of consideration. Lawsuits usually involve one party who is right and one who is wrong. It is not the potential recovery in the lawsuit that provides consideration in a settlement, but rather the right to pursue the recovery. In this case, Hosemann relinquished his right to pursue his claim that his contract for the purchase of the 1,142 acres was valid. This abandonment of the right to pursue a claim provides the necessary consideration.

¶13. Additionally, the option contract's recital of consideration creates a rebuttable presumption that consideration was provided. The Chancellor put it this way:

> [Creely] puts forth the argument that there was no consideration given for the option agreement. "Where the instrument in controversy contains a statement or recital of consideration, it creates a rebuttable presumption that consideration actually exited." *Daniel v. Snowdoun Ass'n.*, 513 So. 2d 946, 950 (Miss. 1987). [Creely] failed to adequately rebut the presumption created by the recitation contained within the Option agreement. Clearly there was consideration in the dismissal of the lawsuit.

6

¶14. Creely contends that Hosemann did not have any "rights" to purchase the land because Creely entered into a contract six days prior to Hosemann's entering into the Buck Ridge Real Estate Purchase and Agreement. Therefore, he says his contract took precedence because Mississippi is a race-notice state; first in time is first in right. This is nothing more than post-settlement argument of the merits of the litigation, which is ineffective to disturb the settlement.

¶15. Creely also claims he is entitled to set aside Hosemann's claim of consideration because it was based upon a misrepresentation. Creely says Hosemann falsely represented that the rights to the land under the Buck Ridge Contract were his personally as opposed to those of the Buck Ridge Hunting Club. At trial, Creely testified that Hosemann claimed "he" had a contract to purchase the same land.

¶16. To support his position, Creely cites *Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co.*, 584 So. 2d 1254 (Miss. 1991), which says:

> The representation was material, it induced the appellees to execute the supplemental agreement, and it was false. The result here is the same regardless of whether the misrepresentation was wilfully and knowingly made or whether it was innocently made.

*Id.* at 1258, citing *McGee v. Clark*, 343 So. 2d 486, 488-89 (Miss. 1977).

¶17. Creely also cites *Sellars v. Grant*, 196 F.2d 677, 679 (5th Cir. 1952), which states that "it would be unjust to allow one who has made material false representations, however innocently, to retain the fruits of a bargain induced thereby."

¶18. We find Creely's position quite curious, given the proof at trial, including Creely's own testimony. The record reflects that during an October 5, 1999, meeting (which was three

7

weeks after Hosemann's contract was signed) Creely learned that his own contract had not been properly executed. "Dan O'Neal and E. C. Stuart, Jr.," were listed as sellers on Creely's September 11 contract, but only O'Neal signed as seller. Additionally, Creely learned that neither O'Neal nor Stewart was a record owner of the property. To make matters worse for Creely, an addendum to the contract was signed only by O'Neal.[5]

¶19.     Having learned of the defects in his own contract, Creely re-negotiated and entered into a new contract dated October 5, 1999, between Danmar, Inc. and Stuart Land and Timber, L.L.C., as sellers, and Earl Creely as buyer. The new contract had additional terms and a purchase price of $50,000 more than the contract dated September 11, 1999. Furthermore, the new contract does not reference the September 11, 1999, contract.

¶20.     Creely testified he never informed Hosemann of the defects in his September 11, 1999, contract. At trial, Creely provided the following testimony in response to questions from Hosemann's attorney:

> Q.  And likewise, you didn't tell Delbert, now Delbert, now we're fixing to settle up, and I'm going to get the property, and you're just going to get an option. And, you know, my contract is really not signed by the owner? You didn't tell him that; did you?
>
> A.  No, Sir.
>
> Q.  And you didn't tell him that your contract had terms that you had added that had not been agreed to in writing by the owner; did you?
>
> A.  No, sir.
>
> Q.  So because both of you came, and you said, okay, we recognize we've got claims - - good, bad or somewhere in between - - can we work it out?
> And that's what y'all did.

---

[5]O'Neal is the President of Danmar, Inc.

8

A.  That's correct.

¶21.    So, in summary, Creely claims Hosemann was guilty of misrepresentation and fraud. In truth, however, Creely's operative contract was clearly signed after Hosemann's contract, and it was Creely who did not inform Hosemann of this and other defects.  Under Creely's theory of consideration, it is Creely, not Hosemann, who failed to provide consideration for the option contract.

¶22.    Creely argues that Hosemann should not be allowed to personally seek enforcement of the option contract because the buyer in the real estate contract was Buck Ridge Hunting Club, not Hosemann.  However, Hosemann points out that this Court has held:

> [A]n executive officer of a close corporation . . . in carrying on the usual business of the corporation has the same apparent authority as a partner in a partnership as against third parties who in good faith rely upon his representations.

*Baxter Porter & Sons Well Servicing Co. v. Venture Oil Corp.*, 488 So. 2d 793, 796 (Miss. 1986).  Hosemann was the sole shareholder of Buck Ridge Hunting Club.  Hosemann contends that the evidence was undisputed that Hosemann had the authority to sign the Option Contract to bind Buck Ridge Hunting Club and to release the corporation's contract claim to purchase the property.  Hosemann points out that after the October 5, 1999 agreement, there was never any claim by Hosemann or Buck Ridge Hunting Club of any contract rights in purchasing the 1142 acres of land.

¶23.    While Hosemann's argument is sound, it is irrelevant.  Creely does not question whether Hosemann had authority to bind Buck Ridge Hunting Club.  Rather, he alleges that Hosemann misrepresented to him that Hosemann personally had a contract to purchase the

9

same property. Creely asserts that if he had known that Hosemann did not personally have the contract, he would not have entered into the option agreement.

¶24. Hosemann testified that there was a discussion at the meeting regarding him taking the option in his own name:

> Q  Now, was there any discussion in these conversations about you, Delbert Hosemann, signing the option, as opposed to the corporation signing the option?
>
> A  Yeah. I explained. When we got there, I said, well, I'm going to take this in my own name, then, because I wanted my three children to be able to hunt. One of my sons is an active hunter, so we discussed the fact that I would take it as "Delbert Hosemann."
>
> Q  Did you have any discussions about the contract, your contract, being in the name of the corporation, as opposed to Delbert Hosemann, personally?
>
> A  Only from the standpoint that I would give the releases -- all the releases -- personally and corporately or anything else they wanted, but that I was going to assign this to me; and I was going to close it in my name because I wanted my children to have a part of it.
>
> And, also, I had started that corporation to own the entire property, the whole 1100 acres, which was at one point a $1 million purchase. So I would have to have other stockholders. But I could afford to purchase half the property just myself. So I had intended to use the corporation, really, as a financing vehicle to have other stockholders. But since it was going to be he and I, I told him I wouldn't use Buck Ridge. I was just going to use my own personal funds, and I'd buy it just myself.
>
> Q  How did you expect to effect that change, if you will, from the corporation having the contract to you buying the property personally?
>
> A  Well, I assigned it to myself. It was a pretty close meeting. It was just me there. And so I said, well, I'm going to assign this to myself, and then I'll go forward. So I was -- I was the president and the stockholder of the corporation and assigned it to my own self, so there wasn't any real big meeting involved. We just agreed to it.

10

¶25. Hosemann did sign the option contract individually and not in the name of his corporation. Subsequently, Hosemann executed a Resolution of Buck Ridge Hunting Club of Mississippi, Inc.[6] which provided:

> This Resolution will confirm and memorialize that on October 5, 1999 prior to Delbert Hosemann's execution of the Option Agreement with Andrew Earl Creely Sr., Buck Ridge Hunting Club Inc. of Mississippi acting by and through its only Director, Officer and Shareholder did assign all of its rights under the Real Estate Purchase and Sale Agreement by and between Danmar, Inc./Stuart Company and Buck Ridge Hunting Club, Inc. of Mississippi dated September 17, 1999 to Delbert Hosemann in consideration for Delbert Hosemann Jr.'s agreement to take over all of Buck Ridge Hunting Club Inc.'s obligations and liabilities under the Real Estate Purchase and Sale Agreement.

¶26. There is no question that Hosemann had the authority to sign the option agreement and bind Buck Ridge Hunting Club to the consideration that was given for the option. Subsequently, a Resolution was executed which memorialized the October 5, 1999 transaction and assigned all of the rights of the contract to Hosemann individually.

¶27. Based upon these facts which are reflected in the record, we cannot say the Chancellor abused his discretion, and we find this issue void of any merit.

### II.    Exercise of the Option.

¶28. The precise issue Creely raises is whether the language of the option agreement, "Said Option is to be exercised by November 25, 1999," sets Hosemann's deadline for notifying Creely of intent to exercise the option or for closing the purchase by payment of the purchase price and transfer of title.

---

[6]This resolution was signed by Hosemann as the President and Director of Buck Ridge Hunting Club but was not dated.

¶29.	In *Busching v. Griffin*, 542 So. 2d 861, 864 (Miss. 1989), this Court held that written notice to the seller of intent of the option holder to exercise an option has the effect of an acceptance, converting the option into an enforceable bilateral contract. It is not necessary for an option holder to tender the purchase price in order to exercise the option. *Id.* at 864-65. The holder of an option is entitled to specific performance of the optioner's duty to convey, so long as the holder is willing to pay the option price. *Id.* at 864.

¶30.	The Chancellor held:

> [Creely] also raises, as a defense, the argument that [Hosemann] did not exercise the Option within the time allowed by the Option's terms. This Court finds that [Hosemann] did, in fact, exercise the Option prior to the November 25, 1999, deadline. In addition, any delay in the exercising of the Option was due to [Creely's] actions, and finally [Creely's] inaction and delay of never making a final decision on the details of closing the transaction.
>
> \* \* \*
>
> The Court finds that the Option agreement was duly exercised by the November 25, 1999, deadline, and that all that followed was an attempt by both parties to work out the details of closing the transaction, some of which included modifications agreed to by the parties and other modifications not agreed to.

¶31.	We find the Chancellor was exactly correct. The Option Contract contained all the essential terms:

> a.	Description of the property;
> b.	Consideration for purchase of the property; and
> c.	The date by which the option was to be exercised.

*Holifield v. Veterans' Farm & Home Bd.,* 218 Miss. 446, 67 So. 2d 456 (1953); *McCorkle v. Loumiss Timber Co.*, 760 So. 2d 845 (Miss. Ct. App. 2000).

¶32.	In *Duke v. Whatley*, 580 So. 2d 1267 (Miss. 1991), this Court, when making a distinction between an option and right of first refusal contract, held:

12

> The option compels performance within the time limit specified, or if none is mentioned, then within a reasonable time, whereas the right of first refusal has no binding effect unless the offeror decides to sell.
>
> * * *
>
> In the case of an option, as noted above, the option-giver has no choice but to sell when the option is accepted according to its terms. What is usually provided is that there will be an expression of acceptance communicated to the option-giver, or that payment according to the terms of the option will be made within the time limit. Thus, an option is an offer made irrevocable by contract; however, it may be made conditional upon the happening of some specified event.
>
> The option gives a clear right to the option-holder, regardless of the wishes of the option-giver.
>
> Williston on Contracts, § 1441A (Jaeger, 3d ed. 1968).

*Id.* at 1272. Here, the option contract provided a specific time in which Hosemann was required to exercise the option. However, the contract failed to express a closing date. Therefore, the date of closing was to be within a reasonable time from the date of exercising the option. This Court has held that what is a reasonable time "in which to exercise the option depends upon the facts and circumstances of the particular case." ***Miss. Power Co. v. Bennett***, 173 Miss. 109, 161 So. 301, 308 (1935). *See also* ***Mitts v. Price***, 129 Miss. 554, 92 So. 163, 165 (1922).

¶33. As discussed supra, Creely and Hosemann engaged in numerous activities from the exercise of the option by Hosemann until he tendered payment. Thus, we find no merit to this issue.

¶34. We now move to issues III and IV, which we shall discuss together.

**III.    New Consideration.**

**IV.    Seven counter-offers.**

13

¶35. These assignments of errors require a finding that Hosemann made counter-offers and modifications to the option contract. The Chancellor did not so find, and neither do we.

¶36. The Chancellor held:

> [Creely] alleges that [Hosemann] made a counter offer to [Creely] which extinguished the original offer. Although it is true that beginning December 28, 1999, [Hosemann] did first assert several issues not included within the Option agreement, the Court does not find that these negotiations constitute a counter offer rendering the Option agreement extinguished.

¶37. The record amply supports the Chancellor's findings. Both parties made numerous attempts to prepare an acceptable deed and to negotiate missing or unclear terms, but these efforts do not rise to the level of "modifications" or "counter-offers."

¶38. When the option to purchase the land was exercised by Hosemann, the option became a valid and binding contract and the option agreement no longer existed. In *Holifield,* 67 So. 2d at 457-58, this Court held:

> The effect of the acceptance of an outstanding offer in a case of this kind is stated in 66 C.J., p. 528, Vender and Purchaser, par. (66) c, as follows: "Acceptance of an outstanding offer completes the contract, and it is thereupon binding upon both parties, so that neither the offer nor the acceptance can thereafter be revoked. An agreement or offer giving an opportunity to purchase land within a certain time, although without consideration, becomes a binding contract when accepted within that time if it has not been previously been withdrawn."

67 So. 2d at 458.

¶39. This Court also cited 49 Am.Jur. P. 139, par. 118 which stated: "The lack of inadequacy of consideration for an option should not defeat the right to performance of a contract to convey after the option had been accepted, if the price to be paid for the land is adequate." 67 So. 2d at 458.

14

¶40. Furthermore, *Ackerman v. Carpenter*, 29 A.2d 922, 925 (Vt. 1943), although not binding upon us, is persuasive authority for the proposition that once a bilateral contract is created, "the plaintiff could make proposals either to vary or make more specific the terms of the executory contract without jeopardizing her rights thereunder. Such proposals made by one party and not accepted by the other would leave the contract exactly as though the proposals had not been made."

¶41. Creely contends that Hosemann's first "counter-offer" occurred in a letter dated December 28, 1999, from Hosemann to Brock, which stated: "Also, you raised several questions which we need to address including access down the road, etc." This letter was written by Hosemann to Brock concerning a conversation that Hosemann had with Brock. It did not constitute a "counter-offer."

¶42. Creely also points out that Hosemann had Brock prepare a deed which contained an easement that was not a part of the original option. The proposed deed did contain an easement that was described within the option agreement. However, the easement was for the Wiggins Road, which Hosemann and Creely had agreed to construct. Furthermore, Creely granted Hosemann permission to use the road when the water was low. Creely testified he granted permission when they were on good terms. Hosemann concedes that he proposed deed language not contained in the Option Agreement. Hosemann had no duty to prepare the deed. Creely, as seller, was required to transfer the property. If he was dissatisfied with Hosemann's deed, he was free to prepare his own. Including the easement for use of the road, which had been discussed by the parties, did not constitute a modification or counter-offer requiring separate consideration.

15

¶43. Creely testified that another easement in the deed, the Thomas easement, provided Hosemann access to the Twin Lakes. However, on cross-examination, Creely revealed that the opposite was in fact true: Hosemann did not have an easement with respect to the license but would be granted an easement from adjoining land owners. Creely further admitted this language was consistent with the option agreement.

¶44. We find no merit to these assignments of error.

### V. Statute of Frauds.

¶45. Having already determined that there were no material changes to the option contract, we must find this assignment of error is without merit on its face. The Chancellor held:

> The Court further finds that [Hosemann] is entitled to specific performance on the Option agreement, as written. All modifications discussed by the parties were unwritten and thus to enforce them would violate the Statute of Frauds. However, the Court finds that all statutory requirements were met for the enforcement of the original Option agreement as written.

We agree.

### CONCLUSION

¶46. Finding no merit to the assignments of error suggested by Creely, we affirm the judgment of the Chancellor.

¶47. **AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**