ROBERTS, J.,
for the Court:
¶ 1. Brian Keith Richmond acquired a “first right of refusal” to purchase 82.83 acres of property in DeSoto County, Mississippi.[1] Hernando Green Development, Inc. (HGD) later offered to purchase that property. Despite months of communication volleys between Brian and the lawyer who represented the owners of the property, Brian never agreed to meet HGD’s offered purchase price. HGD later assigned its rights in the purchase and sale agreement to EBI, Inc. EBI followed through with the purchase of a one-half interest in the property. Brian then contracted for the other one-half interest at a purchase price less than EBI’s offer.
¶2. EBI sued Brian in the DeSoto County Chancery Court. After trial, the chancellor awarded EBI a declaratory judgment and held that Brian had waived his right of first refusal. The chancellor also held that EBI’s ownership of its one-half interest was free and clear of any claim by Brian. Furthermore, conditioned on certain events on appeal that do not bear mentioning, the chancellor ordered the owner of the other one-half interest in the property to sell her interest to EBI. Aggrieved, Brian appeals. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 3. Annette C. Herbert died on May 23, 1993. She had a will that was probated. Annette left ten acres of her property (the Herbert property) to her grandson, Brian. Annette also left approximately 83.63 acres (the subject property) in DeSoto County, Mississippi, to her two children, James Lamar Herbert Jr. and Brian’s mother, Shirley Ann Richmond, to “share alike.”[2] *861 However, Annette gave Brian a right of first refusal to purchase the subject property “at the current selling price” if James or Shirley decided to sell either of their one-half interests in the subject property.
¶ 4. In August 2003, James and Coldwell Banker executed a listing agreement to sell his interest in both the subject property and the Herbert property. Shirley executed the same listing agreement for the purpose of selling her interest in the subject property in early December 2003. Shortly after Shirley executed the listing agreement that James had already entered, Shirley and James entered a purchase and sale agreement with HGD. HGD agreed to buy both the Herbert property and the subject property for $1,021,000. The agreement also provided for a closing date of January 20, 2004. An addendum (Addendum # 1) to the purchase and sale agreement stated that HGD’s offer was contingent upon Brian declining to exercise his right of first refusal.
¶ 5. James’s and Shirley’s lawyer, Joel P. Walker, sent Brian a letter notifying him of the pending sale. Walker also requested that Brian exercise his right of first refusal or decline to do so. Walker stated that Brian had “until December 22, 2003, to exercise your right of first refusal to purchase the land for [the exact price that HGD agreed to pay] and show proof of ability to finance by a bank letter.” On December 16, 2003, Brian replied. Brian stated that the “terms and requirements of [Walker’s] letter [were] not acceptable” and that they were not “in compliance with the requirements” of his “first right of refusal.” Brian informed Walker that he required the following documents to make an informed decision:
A copy of the fully executed purchase and sale agreement, fully outlining the purchase price, terms of the sale, and all parties involved in the transaction; and
A copy of the real estate appraisal, performed by a licensed and accredited real estate appraiser; and
A copy of the survey of the property, performed by a licensed surveyor; and
A copy of the current flood plain map, including any and all building restrictions; and
A copy of an environmental impact study, performed by an entity approved by the EPA; and
A full mortgage commitment letter from a licensed, reputable lender indicating that a mortgage covering the purchase price, including all closing costs, prorated property taxes and insurance, less the required down payment is fully approved.
In lieu of the above referenced mortgage commitment, a copy of the buyer’s most recent bank statement, indicating that liquid funds in an amount equal to or greater than the purchase price plus all associated costs, is available and will be acceptable; and
To ensure that the purchase price and terms of the purchase and sale agreement are not changed or altered at a later date, within 24 hours of closing as prescribed by federal law, a copy of the HUD-1 Settlement Statement must be made available for my review.
Three days later, Walker replied to Brian and said, “[n]one of the items you requested ... were furnished or requested by *862 [HGD] and will not be furnished to you.” In response, Brian again requested a copy of the purchase and sale agreement and proof of HGD’s ability to purchase. Brian also stated that he would “pursue this matter through the court” if they continued to “find [them]selves at an impasse.”
¶ 6. On December 22, 2003, Brian communicated with Walker again. Brian noted that he had received a faxed copy of the purchase and sale agreement that he had requested. Brian stated that he doubted the strength of HGD’s offer and that he needed James’s and Shirley’s listing agreement, a “Buyer[’]s Letter of Credit, Addendum # 1, and a “[Ilegible copy of the purchase and sales [sic] agreement.”
¶7. On January 14, 2004, Brian sent another letter to Walker. Brian referenced a January 12th phone call in which he spoke to Walker. The exact nature of that phone call is unclear, but Brian went on to say that he was “ready, willing, and able” to buy the subject property. Nevertheless, Brian did not agree to meet HGD’s price. Instead, he insisted that he be allowed to pay the “purchase price less any and all real estate fees.” The next day, Walker responded. Walker reiterated his and Brian’s communications since early December 2003. Walker also stated that Brian’s right of first refusal had expired. Even so, Walker informed Brian that James and Shirley were -willing to give Brian “one last chance” to buy the subject property for the price HGD had agreed to pay. However, Walker informed Brian that he had until 5:00 p.m. the next day to accept. Walker requested a commitment letter to purchase and proof of Brian’s ability to purchase by a “bona fide bank letter.” Walker further stated that Brian had until January 23, 2004, to close. Finally, Walker told Brian that Shirley had agreed to rebate 6% of her portion of the purchase price, but James would not agree to rebate 6% of his portion of the purchase price.
¶ 8. Brian replied the next day. Brian told Walker that he was ready to purchase, but the deadlines were unreasonable. Brian requested a survey of the property, the listing agreement, and the buyer’s letter of credit. Brian also reiterated that he objected to paying a real-estate commission.
¶ 9. Walker next contacted Brian on January 20, 2004. Walker told Brian that his right of first refusal had expired. Three days later, Brian informed Walker that he intended to “proceed with legal action.” He also repeated his offer to purchase the subject property at a price lower than the one HGD had agreed to pay.
¶ 10. On January 27, 2004, Brian contacted Walker again. Brian also sent Walker a purchase and sale agreement by which he offered to buy “the entire 92.83 acres” for the agreed-upon price “less all real estate commission to any of the parties involved.” Three days later, Walker contacted Brian and told him that James would be out of the country until February 27th. Walker requested that Brian extend the deadline of his offer. Additionally, Walker told Brian that he did not have a copy of the listing agreement, but he had been told that the commission rate was 6% to be divided between the buyer’s agent and the sellers’s agent.
¶ 11. The next week, Brian again requested a copy of the listing agreement and a property survey. Walker replied the next day and told Brian that he did not have a copy of either document. A few days later, Walker forwarded a copy of the listing agreement to Brian. The listing agreement confirmed Walker’s earlier statement that the commission rate was 6%. On February 29, 2004, Brian informed Walker that his “original offer of $900,000 without documentation of the prior infor *863 mation requested is still in effect until midnight” on March 2, 2004.
¶ 12. However, Walker later contacted Brian and informed him that James had rejected Brian’s offer. One week after he had rejected Brian’s offer, James conveyed his one-half interest in the subject property to EBI for $459,923-the equivalent of one-half of the agreed-upon purchase price. In April 2004, Shirley and Brian entered a purchase and sale agreement by which she agreed to sell her one-half interest in the subject property to an entity called Herbert Plantation, Inc. for approximately $80,000 less than the price EBI had agreed to pay.[3]
¶ 18. In February 2005, EBI sued Brian. EBI sought a declaratory judgment that Brian had waived his right of first refusal to meet EBI’s purchase price. Additionally, EBI requested that any interest James or Shirley had in the subject property be determined to be “held free and clear of any lien, encumbrance, or cloud on title, related to the ... first right of refusal.” EBI later amended its complaint and requested that the chancellor order Shirley to perform according to the purchase and sale agreement and convey her one-half interest in the subject property to EBI for the agreed-upon purchase price. Finally, EBI sought damages for dirt that Brian sold off of the subject property after EBI had purchased James’s one-half interest. Brian filed an answer, a counterclaim, and a cross-claim against James. On February 11, 2009, the parties went to trial.[4] After the three-day trial, the chancellor requested proposed findings of facts and conclusions of law.
¶ 14. On March 23, 2009, the chancellor entered his opinion. The chancellor found that Brian had never agreed to purchase the subject property at the agreed-upon purchase price. Accordingly, the chancellor concluded that Brian had waived his right of first refusal. The chancellor awarded EBI a declaratory judgment finding that Brian had waived his right of first refusal. The chancellor also awarded EBI a permanent injunction prohibiting Brian from raising any claim to any part of the subject property and prohibiting Brian from disrupting or interfering with EBI’s purchase of Shirley’s one-half share of the subject property. Additionally, the chancellor granted EBI’s request for specific performance by Shirley, requiring that she convey title to her one-half interest in the subject property. Finally, the chancellor awarded EBI a judgment of $2,950 to compensate EBI for dirt that Brian had allowed W.A. Sanders to remove from the subject property after James had conveyed his one-half interest in the subject property to EBI. Aggrieved, Brian appeals.
STANDARD OF REVIEW
¶ 15. The Mississippi Supreme Court has held:
We employ a limited standard of review when reviewing the decision of a chancellor. The findings of a chancellor will not be disturbed on review unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard. The standard of review employed by this Court for review of a chancellor’s decision is abuse of discre *864 tion. However, for questions of law, the standard of review is de novo.
Creely v. Hosemann, 910 So.2d 512, 516 (¶ 11) (Miss.2005) (citation omitted).
ANALYSIS
¶ 16. Brian argues that his right of first refusal was never triggered. According to Brian, HGD’s offer was invalid because it was not from a properly identified third party. Brian also argues that EBI was not a valid purchaser because it was not an “approved assignee.” However, Brian did not raise those arguments during the trial. “Failure to raise an issue in a trial court causes operation of a procedural bar on appeal.” Birrages v. Illinois Cent. R.R. Co., 950 So.2d 188, 194 (¶ 18) (Miss.Ct.App.2006). Consequently, Brian is procedurally barred from raising those arguments on appeal.
¶ 17. “A ‘right of first refusal’ is a conditional option empowering its holder with a preferential right to purchase property on the same terms offered by or to a bona fide purchaser.” 77 Am.Jur.2d Vendor and Purchaser § 34 (2007). “The right of first refusal necessarily requires that the holder be bound by the exact price set and offered by the third party because without such a rule the holder could impede the marketability of the property. 77 Am.Jur.2d Vendor and Purchaser § 35 (2007). In December 2003, Walker gave Brian notice that James and Shirley had received an offer to purchase the subject property. It was then Brian’s obligation to either exercise his option to meet the offer by purchasing the subject property at the “current selling price”— the amount that HGD had offered — or elect not to purchase the subject property at HGD’s price. “[I]t is incumbent upon an optionee to exercise the option in the manner provided in the contract, and unless such requirements are waived, his failure to do so, or his attempt to exercise it in another manner, does not operate to form a binding contract of sale.” Graham v. Anderson, 397 So.2d 71, 72 (Miss.1981) (citing Robinson v. Martel Enters., Inc., 337 So.2d 698 (Miss.1976)).
¶ 18.' “Where nothing in the option limits the way notice of exercise of the option is to be conveyed, anything that amounts to manifestation of the optionee’s determination to accept is sufficient.” 77 Am.Jur.2d Vendor and Purchaser § 42 (2007). Nothing in Annette’s will referenced the manner in which Brian must accept. Written notice certainly would have qualified as acceptance. “[Wjritten notice to the seller of intent of the option holder to exercise an option has the effect of an acceptance, converting the option into an enforceable bilateral contract.” Creely, 910 So.2d at 519 (¶ 29). During the volleys of communication that transpired, Brian never indicated that he intended to meet the offered purchase price. Instead, he attempted to negotiate a more favorable deal at a lower price. Acceptance of an option to buy real property must be absolute and unconditional without modifying the initial terms or imposing new terms. 77 Am.Jur.2d Vendor and Purchaser § 43 (2007). The following circumstances will result in a finding that an optionee has declined to exercise his or her option:
If the optionee attaches conditions to his ... acceptance or notice of his ... election to buy which are not warranted by the terms of the option, such a response amounts to a rejection of the option unless the acceptance is in the first instance unconditional, and the additional term is a mere request for a departure from the terms of the option as to the time and place of completing the transaction ....
Id. Despite numerous opportunities to meet the offered purchase price over the *865 course of the next few months, Brian never did so. Instead, he offered substantially less than the offered purchase price. “[AJttempts to prepare an acceptable deed and to negotiate missing or unclear terms” do not necessarily rise to the level of counteroffers. Creely, 910 So.2d at 521 (¶ 37). Nevertheless, adamant refusal to meet the offered purchase price and protracted attempts to secure a significantly lower purchase price amount to Brian’s failure to exercise his rights according to the terms of the right of first refusal.
¶ 19. Furthermore, Brian’s waiver was not required to be in writing. Although modification of an agreement that falls under the statute of frauds must be in writing, a waiver is not required to be in writing. Canizaro v. Mobile Commc’ns Corp. of Am., 655 So.2d 25, 30 (Miss.1995). We, therefore, find no merit to Brian’s argument on appeal.
¶ 20. THE JUDGMENT OF THE DE-SOTO COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ„ CONCUR.

. Although the document that provided for Brian’s "first right of refusal” referred to it as such, we will use the more commonly accepted description, "right of first refusal.”

. Brian later borrowed money and secured the repayment of that loan with a Deed of Trust on 9.2 acres of the property. Brian also borrowed money and secured the repayment with a Deed of Trust on a house that was located on 1.5 acres, which was also part of the land that Annette devised to him. The 9.2 acres consisted of two tracts: one with 1.77 *861 acres and the other containing 7.43 acres. In 2002, the Deed of Trust on the 9.2 acres was foreclosed. Brian claimed that he bought the promissory note and foreclosed on his own property to circumvent his obligations to the Mississippi State Tax Commission. James later purchased the 9.2 acres from the lender. According to Brian, James was supposed to be a straw buyer. At trial, Brian still considered James a "snake in the grass.”

. Brian was listed as the president of Herbert Plantation.

. During the trial, Brian's testimony indicated that he did not trust anyone involved with the discussions. Brian testified: "I don’t believe my mother ... she can be manipulated.” Brian also testified that Walker, who died before the trial, was “old and he can’t remember s-.” Brian further testified that he was “judgment proof,” and he would "go after [his] mother hook, line, and sinker just as fast as [he would] anybody else.”