# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-00871-SCT

*THOMAS L. SWAREK AND THOMAS A. SWAREK*

*v.*

*DERR PLANTATION, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/07/2015 |
| TRIAL JUDGE: | HON. VICKI R. BARNES |
| TRIAL COURT ATTORNEYS: | ROBERT R. BAILESS |
| | KENNETH B. RECTOR |
| | LEE DAVIS THAMES |
| | BENJAMIN McRAE WATSON |
| COURT FROM WHICH APPEALED: | ISSAQUENA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | BENJAMIN McRAE WATSON |
| | JOHN C. HENEGAN |
| ATTORNEYS FOR APPELLEE: | KENNETH B. RECTOR |
| | ROBERT R. BAILESS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 04/06/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     Thomas L. Swarek and Thomas A. Swarek, father and son, appeal from the Issaquena County Chancery Court's finding that no binding enforceable contract existed between the Swareks and Derr Plantation, Inc. (DPI) for the lease and purchase and sale of Derr Plantation to the Swareks, thus denying Swareks' equitable-relief request for specific performance. We affirm the judgment of the chancery court.

## FACTS

¶2.     The Swareks are Mississippi residents, residing in Harrison County.  This action involves the father's negotiations with DPI,[1] a Mississippi corporation and owner of Derr Plantation–a tract of Mississippi Delta farmland located in Sharkey and Issaquena Counties, Mississippi, consisting of approximately 8,355 acres.

¶3.     Derr Plantation is owned by a German limited partnership, Wohnbau-Gesellschaft H. Derr mbH (Wohnbau Derr), the sole stockholder of DPI during the relevant time period of December 2004 through May 2005.[2]  Herman Derr, age ninety-one, was DPI's president.

¶4.     In 2003, DPI advertised Derr Plantation for sale at $10.5 million.  In December 2004, Swarek sent a handwritten message by fax to DPI, expressing an interest in buying the property for $7 million.

¶5.     Joachim Witt, an attorney in Germany working for Derr, called Swarek and informed him that the asking price was $10.5 million.[3]  During their phone conversation, Swarek told Witt that he was in contact with Greg Galloway, who worked for Metropolitan Life Insurance Company (MetLife), and that he (Swarek) could obtain financing to purchase the property. DPI, however, rejected Swarek's offers as too low.

---

[1] Swarek's son was not a party to any of the negotiations and had no contact with DPI at any time.

[2] DPI commenced its farming operations in Mississippi in 1978.

[3] Witt, who speaks some English, was responsible for finding potential buyers for Derr Plantation.

¶6.     Afterward, Witt sent Swarek a letter signed by both Witt and Derr, thanking him for his interest in purchasing the property. Attached to the letter was a short sales prospectus of the property.

¶7.     Later that month, Swarek wrote Derr and Witt, saying he had sent a signed contract to Paul Pillat of Transactional Ventures, Inc. Swarek testified he sent the proposed contract through Pillat because Witt had directed him to Pillat. DPI had been involved with Pillat for the purpose of providing reports regarding the property, along with interested buyers.

¶8.     On January 2, 2005, Pillat sent a letter to DPI with Swarek's offer that provided for the purchase price of $7 million. DPI again rejected the offer.

¶9.     On January 13, 2005, Derr, who did not speak English, sent a letter translated by Witt, indicating an interest in Swarek's offer to lease the property before purchasing it, which would increase the total consideration. Swarek had been in telephone communications with Witt and there were discussions about entering into a lease agreement prior to an eventual sale. The January 13 letter contained a mention of DPI's current tenant, James Hay, the principal of "JAPATAHA" (a general partnership), along with the statement, "We did not yet decide on a continuation of a lease with him."

¶10.   On January 18, 2005, Witt sent a letter to Swarek with a drafted lease contract attached to it. The lease contract proposed a right of first refusal for Swarek. Swarek wrote back, indicating he was interested in leasing the farm only in order to purchase it, and he did not want a right of first refusal. Swarek made a number of proposals in the letter including again, a purchase offer of $7 million.

¶11. By January 20, 2005, DPI had offered Swarek an alternative proposal that allowed for a lease period of two years for $250,000 per year, with a final purchase price of the farm for $7.5 million. DPI also proposed $50,000 in earnest money, and the request that Swarek provide "reasonable security" for the payments.

¶12. The following day, Derr sent Swarek a letter stating that DPI had received a "more favourable offer" by a "serious potential purchaser" which DPI would like to negotiate. Derr sent a similar letter to Pillat the same day. Witt later testified there were no other serious potential buyers during this time.

¶13. On January 26, 2005, Derr sent a letter to Swarek informing him they were preparing contract drafts to be sent to Swarek, notwithstanding the other "competitive" offer.

¶14. On January 27, 2005, Swarek responded and proposed a three-year lease with a payment of the purchase price "on or before February 28, 2007," which would be "after the three (3) year rental period." The proposal was for three annual lease payments of $250,000 for a total of $750,000 within two years, and then to purchase the property on or before February 28, 2007 for $7.5 million. Swarek further offered, inter alia, to pay the property taxes for the years 2004, 2005, and 2006.

¶15. Subsequently, on January 30, 2005, DPI wrote to Swarek to clarify the "contradictory" terms. Witt testified that he telephoned Swarek to confirm the terms of Swarek's offer, and Swarek affirmed that the terms were correct. Swarek had not yet received the January 30 letter, but Witt testified he read the letter to him over the phone.

4

¶16. On February 9, 2005, Swarek also offered immediately to prepay $498,000 to DPI's bank account to resolve DPI's concern about future payments being secured. As a result, Witt prepared a letter to Swarek, reviewed and signed by Derr, on February 10, 2005. The letter indicated that DPI "is ready and willing to accept entering into a Lease and Sale and Purchase Contract with you in compliance with your proposals by your fax from January 27, 2004 (5:48 p.m.)[.]" The February 10 letter contained the "present lease and purchase conditions" of Swarek's proposal; that is, three lease payments totaling $750,000 within two years and the purchase price of $7.5 million on February 28, 2007 (plus an additional amount for taxes and insurance). The February 10 letter also indicated that "drafted detailed Lease Contract through December 31, 2007[,] and Purchase and Sale Contract including providing closing for February 28, 2007[,] are to be agreed upon and to be executed by March 1, 2005[,] or another date to be arranged between seller and purchaser[.]" Further, the February 10 letter indicated that $50,000 in earnest money was to be paid at the "execution of sale and purchase contract."

¶17. The February 10 letter concluded with the following: "Drafted detailed Lease–and Purchase and Sale Contracts will be submitted to you by Monday, February 14, 2005, as already announced. For the execution of both these necessary contracts we should like to propose and provide a date beginning from February 28, 2005."

¶18. Swarek had offered to come to Germany to execute the Lease and Purchase and Sale contracts, which Derr accepted in the February 10 letter. Swarek and his wife arrived in Dusseldorf, Germany, the evening of February 13, 2005. Swarek testified he called Witt

while he was in Paris earlier that day to let him know he was coming to Germany. Swarek testified he was "anxious" to get a firm and binding offer signed so he could begin farming, as it was getting late in the season. Witt testified he was surprised at Swarek's early arrival, but he met the Swareks and dined with them that evening, informing Swarek that, although the proposed purchase contract was not yet completed, the lease contract was finished.

¶19. The following day, February 14, 2005, Witt brought the Swareks to the offices of Wohnbau Derr. Witt testified that Swarek informed him that he needed a statement signed by Witt and Derr to facilitate the financing by MetLife. Swarek testified that MetLife needed a firm and binding offer. Swarek then handwrote a document. Witt dictated this document to his secretary, who typed the document in both German and English, hereinafter the "February 14 document." Witt made modifications to the handwritten statement, which included deleting the words "option to" from the phrase "option to sell." The typewritten February 14 document incorporated the terms and conditions of the February 10 letter. Swarek then signed the document.

¶20. Afterward, Swarek waited downstairs while Witt left to present the document to Derr. Following a brief discussion of the document with Witt, Derr and Witt signed the document. The document was given back to Swarek and a copy was made for DPI's files.

¶21. Swarek and his wife then met and visited with Derr in his office for ten to twenty minutes, with other board directors present. Swarek testified that the issue of payment was never brought up, even though he had brought his checkbook with him on the trip. Wolfgang Terjung, one of Wohnbau Derr's board of directors, who was present, testified there were

conversations about meeting Swarek on the farm in Mississippi by the next week to discuss the current tenant, Jim Hay, and to prepare a smooth transition. Mrs. Swarek took a photo of Swarek handing Derr a one-dollar bill.

¶22. During Swarek's visit in Germany, Witt gave Swarek the lease he had drafted and a letter that identified a bank for the deposit of the $498,000, although the information for the bank account was incorrect and had to be corrected by Witt. There was testimony that Swarek wrote the new information onto the document. The parties did not execute the lease agreement in Germany. Immediately following the meeting with Derr and the other DPI directors, Witt took the Swareks to the airport for their return flight to the United States. The Swareks arrived back in Mississippi by February 16, 2005.

¶23. On February 15, 2005, DPI sent a letter to Swarek that Swarek later testified he did not receive until after the lawsuit had been filed, which gave Swarek the correct wiring instructions for the advance payment of $498,000. Also on February 15, Swarek sent a fax to DPI, in which Swarek stated there was an agreement for his son, Thomas Swarek, to be one of the "buyers and or lessors (sic) to the option to purchase and lease." According to DPI on appeal, Swarek used the word "option" to describe the status of the existing negotiations with DPI.

¶24. On February 16, 2005, Swarek telephoned Witt and told him the February 10 letter contained a mistake that had originated in Swarek's offer. Swarek testified he had made a typo, and he had intended to close the purchase of the DPI property by February 28, 2008, not February 28, 2007. Essentially, Swarek said he meant to pay only two lease payments

7

within two years, not three lease payments within two years. Swarek told Witt he intended to pay base lease payments totaling $500,000 for a total consideration of $8 million instead of lease payments of $750,000 for a total consideration of $8.25 million as stated in the February 14 document. Swarek threatened to withdraw his offer altogether if DPI refused to renegotiate the terms of the transaction and told Witt that DPI would be required to file suit for specific performance if DPI insisted upon the terms contained in the February 10 letter.

¶25.    Swarek additionally wrote DPI on February 16, 2005, stating he was "sorry for this mistake on my part and will increase the earnest money towards the purchase by ($100,000.00) One Hundred Thousand Dollars and will increase the purchase price earnest amount by ($100,000) One Hundred Thousand Dollars on March 1, 2006." Swarek concluded in the letter that, "I will agree to you [sic] fax prior to my fax to you on January 27, 2005 . . . in which you offer me the property for (2) years rental and a final price of ($7,500,000) 7.5 Million Dollars on February 28, 2007."

¶26.    On February 18, 2005, Derr sent Swarek a letter that stated DPI was "ready and willing to accept entering into a Lease and Sale and Purchase Contract with you in compliance with your submitted modified proposals." The February 18 letter contained a new lease and purchase agreement that increased the initial earnest money to $100,000. It also required a "trustworthy guarantee" of the additional earnest money payment offered by Swarek. The last paragraph further provided that DPI's "right of withdrawal from this foregoing agreement will be reserved until February 28, 2005, in the event of its exercise to

8

the result, that the agreement from January 27, February 10 and 16, 2005[,] remains in full effect." DPI provided Swarek with a proposed sale and purchase contract and a proposed lease agreement. Swarek refused to sign this February 18 agreement, because a provision contained in the February 14, 2005, instrument, saying that the contract was firm and binding and that it might be altered only in the form of a written agreement by both parties, had not carried over. And Swarek wanted nothing short of "firm and binding." Swarek also testified that he did not understand what constituted a "trustworthy guarantee."

¶27. On February 19, 2005, Witt arrived in Mississippi, and Terjung arrived the next day in accordance with the February 10 letter, which stated that Witt and Terjung would stay on the farm in order to "prepare the delivery of possession of the lease property."

¶28. Conversations between Swarek and Witt, and Witt and C.P. Clay, a friend of Swarek's who was familiar with the property in dispute, occurred on February 20 and 21, 2005, which included conversations concerning DPI's current tenant, Hay. The conversations eventually culminated in Swarek requesting DPI to choose among three (3) proposals, which included two new proposals by Swarek in addition to the proposals made by Swarek on February 16. Swarek did not include an offer to perform the terms contained in the February 14 document. Swarek also insisted for the first time that he should have the right to purchase Derr Plantation prior to February 28, 2007. This right would allow Swarek to terminate his obligation to pay any lease payments and further reduce the consideration due to DPI to an amount less than that stipulated in the February 14 document and in the February 16 letter Swarek sent to DPI.

¶29. Ultimately, negotiations broke down, and DPI decided to discontinue communications with Swarek. On February 22, 2005, Swarek's attorney, Bill Bost, sent a letter to DPI's Mississippi attorney, Bobby Bailess. The letter insisted that Swarek "remains ready, willing, and able to perform" under the terms and conditions contained in the February 10, 2005, letter, as referred to in the February 14 document. Bailess replied on February 22, 2005, and gave permission for Swarek and/or MetLife to inspect the property. The next day, Bailess wrote to Swarek, saying that DPI did not consider an enforceable contract to exist between the parties.

¶30. On February 28, 2005, Bost sent a letter to Bailess, stating in part: "Derr is to deliver a sales agreement and lease agreement. The agreements previously furnished can be modified to correct the earnest money deposit and to otherwise make them comply with the February 10 agreement."

¶31. On March 1, 2005, the Swareks filed a complaint and lis pendens notice against DPI and Derr in the chancery court, alleging breach of contract and seeking specific performance and compensatory and punitive damages in the amount of $6,675,000.[4] After extensive pretrial motions and other delays, a ten-day trial was held on the merits, beginning in January 2013 and concluding on September 27, 2013. The chancery court heard extensive testimony from the parties and subsequently found that the February 14 document was executed when the parties had not agreed on all of the material provisions, and was not intended as a contract for the sale of the property; thus, it was incomplete and could not be given legal effect.

---

[4] In 2010, the Swareks dismissed their claims with prejudice against Derr in his individual capacity.

Accordingly, the court found no binding and enforceable contract existed between the parties for the lease and purchase and sale of Derr Plantation to the Swareks and therefore denied the Swareks' request for specific performance and damages.

¶32. This appeal followed, with the three following assignments of error raised by the Swareks, summarized here as follows: (1) the trial court erred as a matter of law in finding ambiguity about the specific date for signing the additional documents required by the contract; (2) the trial court erred as a matter of law when, upon finding ambiguity about the specific execution date for the lease and purchase documents, it then failed to (a) determine a reasonable time for the parties to complete the preparation and signing of the those documents; and (b) order the parties to do so within a reasonable time; and (3) the trial court erred when, upon finding an ambiguity about the specific execution date for the two documents, it then relied upon trial testimony to find that the parties never had intended to enter into a binding contract, despite the documents' clear and unambiguous language that it was "firm and binding" on the parties.

¶33. The Swareks ask that we reverse the chancery court's judgment and direct the court to order specific performance of the "February 14 contract," whereby DPI transfers Derr Plantation to the Swareks in exchange for (a) $8.25 million to DPI (which represents the total amount of the lease and purchase payments); or (b) in the alternative, if DPI is not entitled to payment of the amounts related to the lease payments since the lease term has expired and cannot be specifically enforced, then payment of $7.5 million to DPI within a reasonable time not to exceed 120 days from the entry of this Court's mandate.

## DISCUSSION

¶34. While specific performance is an appropriate remedy in matters relating to real property, it is not a matter of right in Mississippi, but is a matter of grace. *Roberts v. Spence*, 209 So. 2d 623, 625 (Miss. 1968). An application for specific performance is left to the chancery court's sound discretion, "controlled and regulated by established equitable principles." *Id*. Moreover, "[s]uits for specific performance are not governed by the same principles as suits at law for damages or suits in equity to set aside executed contracts." *Picket v. Boutwell*, 125 So. 2d 822, 823 (Miss. 1961). In such suits, "a weaker case is sufficient to defeat the action." *Id*.

¶35. At the outset, we agree with the chancery court that no sufficient meeting of the minds occurred between the parties as to the terms and conditions set forth in the February 10 letter. Thus, the February 14 document did not constitute a valid and enforceable contract. But, even if we were to conclude that it did constitute a valid contract, the facts attending this case indisputably show that Swarek repudiated it by the manifestations and declarations he made thereafter.

¶36. Again, on February 16, Swarek informed DPI that he had intended to pay only two, not three, lease payments within two years, which would have resulted in a total purchase price of $8 million for the property, not $8.25 million as set forth in the February 10 letter.

¶37. Swarek then told DPI that if it insisted on the terms contained in the February 10 letter, he would walk away from the deal, and DPI would have to sue him for "specific performance."

12

¶38.    Still willing to negotiate with Swarek, DPI sent another proposal to Swarek on February 18, agreeing to the new terms Swarek had expressed on February 16.  But the February 18 proposal required Swarek to provide a "trustworthy guarantee" for the payment of additional earnest money Swarek offered to pay, due to what Swarek claimed was a "mistake" on his part with regard to the total number of lease payments and the final purchase price set forth in the February 10 letter.  Swarek refused to sign the February 18 proposal because Swarek wanting "nothing short of firm and binding[,]" and Swarek did not understand what constituted a "trustworthy guarantee."

¶39.    Afterward, when Witt and Terjung arrived in Mississippi to "prepare the delivery of possession of the lease property[,]"  Swarek proposed three new options for DPI, none of which included an offer to perform the terms contained in the February 10 letter, incorporated into the February 14 document.

¶40.    DPI effectively walked away from the table at that point.  And the Swareks then sued DPI in chancery court, claiming they were "ready and willing" to perform under the terms and conditions contained in the February 10 letter, which they maintain were made firm and binding by the February 14 document.

¶41.    We agree with DPI that this case is somewhat similar to *Gulf South Capital Corporation v. Brown*, 183 So. 2d 802 (Miss. 1966).  There, the president of Gulf South had negotiated with the executor of an estate for the purchase of a motel owned by the estate.  *Id*. at 803.  The buyer and seller thought they had agreed on the terms of the purchase, and the buyer drafted and presented the seller a purchase contract, which the parties then executed.

13

*Id*. The next day, the buyer sent the seller a check for the earnest-money deposit in the amount agreed upon. *Id*. At the bottom of the check, the buyer included a notation, which stated in part: "This deposit returnable in the event good title cannot be conveyed to Gulf South . . . as specified in [the] agreement[,] . . . or if suitable agreement cannot be reached on eliminating Materials Lien recorded against property by James J. Curro." *Id*. The seller considered the materials-lien provision to constitute a new condition; rejected it, and returned the check to the buyer. *Id*. at 804. The buyer then sued the seller in circuit court for breach of contract. *Id*. The circuit court found that the purchase contract was ambiguous and omitted important necessary provisions, and ruled in favor of the seller. *Id*.

¶42. This Court affirmed the circuit court on appeal. Declining to consider all the circuit court's reasons for dismissal of the suit, the ***Brown*** Court concluded that the buyer "materially breached its contract, and in effect repudiated it, by tendering earnest money subject to an unacceptable, material condition[,]" i.e., the materials-lien provision. *Id*. ***Brown*** reasoned that, "[i[f the buyer has committed a material breach, or has by repudiation manifested an intention to commit such, the other party should be excused from the obligation to perform further." *Id*. (citing 6 Williston, *Contracts* § 864 (3d ed. 1962); *Restatement of Contracts* § 275 (1932)). "The materiality of the breach is the decisive factor." *Id*. "Repudiation of a material part of the contract excuses the other party, although a breach may be material without such repudiation, and if so, should excuse the injured party." *Id*. at 805 (citing 6 Williston, *Contracts* § 865 (3d ed. 1962)). "Thus the repudiation

14

of his duty by one of the parties terminates the duty of the other, giving the latter the legal privilege of refusing to render the return performance." ***Id***.

¶43. That is essentially what occurred here. Based on Swarek's communications with DPI on February 16, and subsequent thereto, there was a substantial, material variance between DPI's understanding of the terms set forth in the February 10 letter and the terms Swarek said he had intended. These terms concerned the duration of the lease and the total purchase price for the property, and were no doubt material. Swarek having informed DPI he would not perform according to the terms contained in the February 10 letter, DPI was excused from any return performance obligation(s) it may have had under those terms.

¶44. On appeal, the Swareks rely on ***Prestenbach v. Collins***, 159 So. 3d 531 (Miss. 2014), and ***Creely v. Hosemann***, 910 So. 2d 512 (Miss. 2005), for their argument(s) contending that the chancery court erred in finding ambiguity about the specific execution date for the lease and purchase documents. Those cases, however, are inapplicable here, as they involved the validity and enforceability of option contracts. That may have been what the Swareks and DPI were attempting to enter into eventually at the closing scheduled for February 28 through March 1, 2005, in this matter. But the February 14 document did not constitute this type of contract.

## CONCLUSION

¶45. For the above stated reasons, we affirm the chancery court's decision to deny the Swareks' request for specific performance.

¶46. **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, MAXWELL AND CHAMBERLIN, JJ., CONCUR.**